The COMMONWEALTH OF MASSA-CHUSETTS, By its DEPARTMENT OF PUBLIC WELFARE, Plaintiff, Appellee,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, et al., Defendants, Appellants.

No. 84–1197.

United States Court of Appeals, First Circuit.

Argued Aug. 8, 1984.

Decided Nov. 28, 1984.

Robert A. Dublin, Washington, D.C., Atty., Office of the Gen. Counsel, Dept. of Health and Human Services, with whom Juan A. Del Real, Gen. Counsel, Office of the Gen. Counsel, Dept. of Health and Human Services, and Ann T. Hunsaker, Asst. Gen. Counsel, Dept. of Health and Human Services, Washington, D.C., were on brief, for defendants, appellants.

William L. Pardee, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Ellen L. Janos, Asst. Atty. Gen., Boston, Mass., were on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and PEREZ–GIMENEZ,* District Judge.

LEVIN H. CAMPBELL, Chief Judge.

This appeal involves a dispute between Massachusetts and the Secretary of Health and Human Services ("the Secretary") over Massachusetts' right to be federally reimbursed for certain unrecovered advances to nursing homes. Procedural aspects of the dispute were previously before us in *Massachusetts v. Departmental Grant Appeals Board*, 698 F.2d 22 (1st Cir.1983). We held there that 42 U.S.C. § 1316(a)(3) did not authorize direct review by a court of appeals of the challenged decision of the Secretary's Departmental Grant Appeals Board. The instant proceeding was then pending in the district court, Massachusetts having also sought review in the district court from the same agency ruling. *See Massachusetts*, 698 F.2d at 26. When denying direct court of appeals review, we anticipated Massachusetts would proceed below, and that the losing party would eventually come to us on appeal. *Massachusetts*, 698 F.2d at 30. That appeal is now here, the district court having decided in favor of Massachusetts and against the Secretary in an opinion published at 576 F.Supp. 1565 (1984).

I. FACTS

The nature of this dispute is set out in our opinion in *Massachusetts*, 698 F.2d at 23–24. It arises under the Medicaid statute. 42 U.S.C. § 1396a entitles those states that choose to establish a Medicaid program and that submit to the Secretary a state plan fulfilling the requirements of the Medicaid statute and implementing regulations, to receive federal grants in partial reimbursement of expenses incurred in providing medical assistance to Medicaid recipients. Federal grants are paid in advance of each quarter based on an estimate provided by the state. 42 U.S.C. § 1396b(d). After actual expenditures are determined, the federal grant for the next quarter is "reduced or increased by the amount of any overpayment or underpayment which the Secretary determines was made." *Id.* The controverted sums here are ones which the Secretary claims a right to recover as "overpayments," and which Massachusetts strenuously insists are not "overpayments."

To reimburse nursing homes and other health care providers for the medical assistance they render to medicaid recipients, Massachusetts employs a system of interim estimates, sometimes called "retrospective rate-setting." Under this system (which some but by no means all states employ), Massachusetts begins by setting an interim rate for each provider based on the provider's costs during the previous year. Utilizing this interim rate, Massachusetts then advances to the provider an interim amount at the beginning of each month for the estimated cost of services to be provided that month. Mass.Gen.Laws ch. 6A, § 32. At the close of the rate year, the Massachusetts Rate-Setting Commission performs a complete desk audit of the provider's cost reports, supplemented when necessary by an on-site audit of the provider's books and records, Mass.Admin.Code tit. 114.2, § 2.04(4), to determine the provider's actual costs. A final rate is then set which, if lower than the interim rate, causes Massachusetts to owe to the provider a smaller amount than it advanced in the past year. Massachusetts undertakes to recover any such differential in its favor by billing the provider or by making offsets against subsequent interim payments. *See* Mass.Admin.Code tit. 106, § 456.701–.704.

Federal quarterly grants reflect Massachusetts' retrospective rate-setting approach. Thus Massachusetts initially receives from the federal government an amount based on the Commonwealth's interim disbursements to providers. Subse-

---

* Of the District of Puerto Rico, sitting by designation.

quent grants will reflect any adjustments deemed appropriate in light of final provider rates. In the past, Massachusetts has not reported amounts attributable to any retroactive rate decrease as a decreasing adjustment to the next quarter's federal grant until it actually recovers the differential from the provider. This practice is in keeping with its view that no "overpayment" has occurred until the state actually recovers the excess amount from the provider.

The instant dispute arose when the Massachusetts Department of Public Welfare ("the Department") failed to recover from certain providers the difference between what it had paid them on the basis of interim rates and the lesser amounts owed to the same providers under smaller final rates. Massachusetts failed to recover because these providers had become bankrupt or were otherwise unable or unwilling to meet their payment obligations after the final rates took effect. Notwithstanding Massachusetts' inability to recover these sums,[1] the Secretary insisted that the Commonwealth owed them to her as "overpayments" within the meaning of 42 U.S.C. § 1396b(d)(2). It was and is the Secretary's position that grants to a state under the Medicaid program are limited to the costs incurred for "medical assistance";

and that since these costs are most accurately determined under Massachusetts' retrospective system by the state's own final rates, any overage which the Secretary advanced under less precise interim rates becomes a recoverable overpayment once a final rate is set whether or not the state itself ever recovers it from a provider.

Massachusetts vigorously protests the Secretary's interpretation. It denies that the sums paid to providers under interim rates are "overpayments," insisting instead that they are a legitimate cost of providing medical assistance until the state itself recoups any differential between the later, final rates. It notes that the Secretary has acquiesced in the Massachusetts system of retrospective rate-setting by her willingness to base initial federal payments on the interim rates. While Massachusetts agrees that it must reimburse the Secretary for all sums actually recovered from providers reflecting the final rates, it contends that it owes no reimbursement for amounts which, in good faith, it cannot recover.[2]

## II. PRIOR PROCEEDINGS

This case originated from an audit by HHS's Health Care Financing Administration ("HCFA") of the accounts receivable ledgers of the Massachusetts Department

---

1. The exact amount at stake in this dispute is unclear. Each party, as well as the district court, cites to a somewhat different figure, but the question of the precise sum is not an issue in this appeal, and we need not try to resolve the disparity.

2. Each party has an immediate statutory basis for its claim. The Secretary relies on section 1396b(d)(2), which provides as follows:

(2) The Secretary shall then pay to the State, in such installments as he may determine, the amount so estimated, reduced or increased to the extent of any overpayment or underpayment which the Secretary determines was made under this section to such State for any prior quarter and with respect to which adjustment has not already been made under this subsection. . . .

Massachusetts, on the other hand, relies on section 1396b(d)(3) which reads,

(3) The pro rata share to which the United States is equitably entitled, as determined by the Secretary, of the net amount recovered during any quarter by the State or any politi-

cal subdivision thereof with respect to medical assistance furnished under the State plan shall be considered an overpayment to be adjusted under this subsection.

In Massachusetts' view, the mere reference in section 1396b(d)(2) to "overpayment" does not empower the Secretary to treat the challenged sums as an overpayment. While (d)(2) authorizes the Secretary to reduce a quarterly grant by "any overpayment or underpayment which *the Secretary determines* was made . . .," (emphasis supplied), Massachusetts nonetheless argues that the Secretary lacks any right to view the state's *unrecovered* excess provider payments as such an "overpayment." Only when the state actually recovers the overage from the provider, so that it now conforms to section 1396b(d)(3), does it become a cognizable "overpayment" in the state's view. Until that time, since the state, like its partner, the federal government, is out-of-pocket, the state has not—in this view—been "overpaid."

of Public Welfare for the period between April and November 1979. Upon discovering a substantial number of unrecovered excess payments to nursing homes made under interim rates, HCFA informed Massachusetts that it had determined to disallow Massachusetts' claim for federal financial participation to the extent of that excess, and would reduce HHS's next quarterly grant to Massachusetts by like amount. Massachusetts appealed this disallowance to the Departmental Grant Appeals Board of HHS, which, on February 26, 1982, sustained the disallowance. Departmental Grant Appeals Board Decision 262, No. 80–54–MA–HC (Feb. 26, 1982). On April 22, 1983, Massachusetts brought the action now before us in the United States District Court for the District of Massachusetts pursuant to 5 U.S.C. § 702. The district court disagreed with the Board. 576 F.Supp. at 1568.

The court found that section 1396b(d), the statute governing overpayments, see. note 2, *supra*, was ambiguous, since it did not define the term "overpayments." 576 F.Supp. at 1568. The court felt that *either* section 1396b(d)(2), which directs the Secretary to reduce the amount of her quarterly grants to a state by the amount of any prior overpayment, *or* section 1396b(d)(3), which entitles the Secretary to treat as an overpayment her share of medical assistance payments recovered by the state, could on its face govern the amount at issue. *Id.* The court went on to conclude that the Secretary had presented no evidence to support her characterization of the differentials as section 1396b(d)(2) overpayments. *Id.* Relying on *Harris v. McCrae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1981), the Court ruled that the general intent of Congress in enacting the Social Security Act was to create a partnership between the states and the federal government in defraying Medicaid costs. Therefore, the Secretary was obliged to bear her share of the loss, since the interim payments giving rise to the supposed overpayments had been made in accordance with a plan that the Secretary had approved. 576 F.Supp. at 1568–69.

## III. ARGUMENTS ON APPEAL

The Secretary argues on appeal that the Medicaid statute clearly contemplates that she recover from Massachusetts, as an overpayment, the federal share of the difference between the interim and final rates of reimbursement by Massachusetts to health care providers. She points to 42 U.S.C. § 1396b(a), which provides that "the Secretary shall pay to each State which has a plan approved under this subchapter ... (1) an amount equal to the Federal medical assistance percentage ... of the total amount expended during such quarter as *medical assistance* under the State plan" (emphasis supplied). "Medical assistance" is defined in section 1396d(a) as "payments of part or all of the cost of [certain enumerated] care and services," including "skilled nursing facility services." Since Massachusetts ultimately determined that the interim rate at which it reimbursed health care providers was higher than their actual cost of providing health care, so the Secretary argues, the difference is not a cost of "skilled nursing facility services," and so not a cost of medical assistance. Therefore, the Secretary is not required by section 1396b(a) to pay any part of the difference between Massachusetts' interim and final rates, and indeed is required by section 1396b(d)(2) to subtract her share of that difference from subsequent grants since that difference is an overpayment.

The Secretary's argument turns on the meaning of "cost," a word the statute leaves undefined. The Secretary contends that the rate differentials at issue here are not part of the "cost" of medical assistance, and hence are overpayments. In reaching this result, she argues that two provisions of the Medicaid statute are in pari materia with section 1396d(a) and hence aid in the interpretation of the word "costs." Those provisions are section 1396a(a)(13)(E) as it existed at the time the payments in dispute were made, which requires a state to set rates to nursing homes on a "reasonable cost related basis," and section 1396a(a)(30), which requires state plans to provide for methods of payments

that will assure that payments "are not in excess of reasonable charges consistent with efficiency, economy, and quality of care." The Secretary argues that these provisions indicate that "cost" as it is used in section 1396d(b) should be construed to mean the cost of care to the providers rather than—as in the case of unrecovered payments—the cost of care to the state.

To fortify her construction of the statute, the Secretary insists that as the official authorized by Congress to carry out the Medicaid program, her interpretation of the Medicaid statute is entitled to judicial deference. The Secretary suggests that her argument for judicial deference is strengthened by the existence of a number of long-standing regulations that govern the recovery of overpayments, see 20 C.F.R. § 201.-5(a)(3), .13–.15, and that require her to treat the rate differentials as overpayments.

Massachusetts' contrary argument begins with the same statutory language as the Secretary's. Massachusetts, too, points out that section 1396b(a) directs the Secretary to pay her share of the "amount expended ... as medical assistance under the State plan." The rate differentials meet both conditions, Massachusetts argues: they were part of the state's cost of medical assistance and, at the time the interim expenditures were made, the amounts were paid out in accordance with a system of prospective rate-setting embodied in Massachusetts' federally approved state plan. Under Massachusetts' argument, it is immaterial that the interim rate is later found to be in excess of the *provider's* cost. What is relevant, in its view, is Massachusetts's cost, and here its out-of-pocket expense remains the interim amount it paid out until such time as it may be reimbursed by a provider. Massachusetts cites for its interpretation *Massachusetts General Hospital v. Weiner*, 569 F.2d 1156, 1158 (1st Cir.1978), which states that prior to 1972, when standards for the reimbursement of nursing homes were added to the section 1396a requirements for state plans, the word "cost" in the context of section 1396a had meant "costs actually incurred," and that this was the understanding of Congress in drafting section 1396d. Massachusetts also cites without explanation a number of HHS regulations in effect during the years in question in support of its interpretation of the word "cost." See 42 C.F.R. § 447.252(a), (c), .315(a), .316(a) (1979).

Massachusetts contends that, because the rate differentials were part of the "amount expended ... as medical assistance under [its] State plan," for the Secretary to deny federal reimbursement for her share of the differentials would amount to the imposition of an additional unauthorized condition on Massachusetts's receipt of federal Medicaid funds beyond those revealed to Massachusetts at the time it agreed to participate in Medicaid. Such an imposition would violate the principle announced in *Pennhurst State School v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1978), that any conditions imposed on the receipt of federal funds by the states be imposed clearly and unambiguously. In support of her contention that the obligation of the Secretary to reimburse is absolute where not expressly conditioned, Massachusetts cites section 1396b(u)(1)(A), which states that the Secretary is barred from reimbursing payments made to ineligible persons where those payments exceed three percent of the total grant to the state "notwithstanding subsection (a)(1)," the subsection imposing the general obligation to reimburse.

As did the district court, Massachusetts also relies upon *Harris v. McCrae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 781, in support of its argument that the federal government is obliged to reimburse the state for its share of the unrecovered rate differentials. In *Harris*, the Supreme Court described Medicaid in general terms as a partnership between the states and the federal government. According to Massachusetts, this partnership concept requires the Secretary to foot her share of the bill for the differentials.

Finally, Massachusetts contrasts the rule-making authority granted the Secretary under certain sections of the welfare

statute—for example, section 1396a(a)(17)(B), which requires a state plan to make certain payments under "standards prescribed by the Secretary"—with section 1302, which states that the Secretary "shall make ... rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration" of her functions. Massachusetts concludes that though the Secretary is entitled to some deference in her interpretation of the statute, she cannot be allowed to interpret it in a manner inconsistent with its letter, as provided in section 1396b(a), and its spirit as portrayed in *Harris.* .

## IV. DISCUSSION

■ While both sides contend that their interpretation of the Medicaid statute is alone reasonable, the statute, as often happens, is itself less than crystal clear. While the question is close, we are persuaded the Secretary is entitled to prevail.

First, the Secretary's construction that the "cost" of medical assistance is measured by the allowable providers' costs, and does not include reimbursement for excess, unrecovered interim advances, seems to us at least as reasonable as Massachusetts's contrary interpretation. It is true, as Massachusetts points out, that the cost to Massachusetts of obtaining health care services from providers who went bankrupt before Massachusetts could recover the rate differentials is the cost as determined at the interim rate; that is the amount that Massachusetts actually paid out. However, it can be said that the fair and reasonable cost of those services is the cost as determined in the final rate, and that Congress could scarcely have meant to reimburse a state for excessive cost of services. While the Secretary allows Massachusetts to use a rate-making system which exposes the state to the risk of loss when a provider defaults, the Secretary arguably does not thereby guarantee the state's bad debts. No custom has been shown, in other Medicare contexts, for federal grants to reimburse a state for losses due to bad debts of this type. *Cf.* 42 C.F.R. § 447.282 (1979) (state plan generally may not provide for the reimbursement of nursing homes for the homes' bad debts).

To be sure, the Secretary has not pointed to regulations or statutory language lending definitive support to her position. The regulations that she cites, 20 C.F.R. § 201.5(a)(3), .13–.15, all concern when and how the Secretary shall recover overpayments, not whether the rate differentials at issue here are or are not overpayments. And, one of the two statutory subsections she says are in pari materia with section 1396d(a), section 1396a(a)(30), refers to "charges," not "costs." The other, section 1396a(a)(13)(E) as it existed during the relevant years, which provided that payments to nursing care providers made under the state plan be on a "reasonable cost related" basis, is arguably not inconsistent with Massachusetts's receiving federal reimbursement for payments made to providers at the interim rates, since it can be asserted that those rates were set on a reasonable cost related basis.

On the other hand, the support for Massachusetts's position is likewise inconclusive.

First, the HHS regulations that Massachusetts cites, 42 C.F.R. § 447.252(a), (c), .315(a), .316(a) (1979), simply set ceilings on the amounts that a state plan may disburse to providers. They thus seem to set necessary but not sufficient conditions for Massachusetts's obtaining federal financial participation for its expenditures. *See* 42 C.F.R. § 447.252(c) (1979) (federal financial participation is "available" for expenditures within limits).

Second, *Massachusetts General Hospital v. Weiner*, 596 F.2d 1156 (1st Cir.1978), the case cited by Massachusetts for the proposition that the word "cost" meant "amount actually expended" at the time section 1396d was enacted, states that proposition without authority and in dicta. The reference is simply too insignificant to be persuasive in this context.

Third, we find both *Harris* and *Pennhurst* inapposite. In *Harris,* the Supreme Court stated that "[t]he cornerstone of Medicaid is financial contribution by both

the Federal Government and the participating State," and that "the purpose of Congress in enacting Title XIX was to provide federal financial assistance for all legitimate state expenditures under an approved Medicaid plan." *Harris,* 448 U.S. at 308–09, 100 S.Ct. at 2683–84. The issue raised in *Harris,* however, was whether the states should be required to pay in full for abortions, the cost of which the Secretary was forbidden by statute from contributing to. *Harris* thus attributes to Congress the intention that no state should be obliged by the Medicaid statute to pay for a service unless the Secretary pays her share, not that the Secretary must pay her share of every out-of-pocket state expense no matter how incurred.

Similarly, *Pennhurst* differs in crucial respects from the case at bar. In *Pennhurst,* the statute being construed, the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. §§ 6000 *et seq.* (1982), contained both a list of specific conditions on the receipt of federal funds and a broad "bill of rights" provision that set out the findings supporting the goals of the Act. The Court held that the latter's statements were merely precatory, imposing no additional obligations on states receiving federal funds under the Act. The present case involves the construction and enforcement of a narrow statutory provision, 42 U.S.C. § 1396b(d). We do not believe that *Pennhurst* requires that every arguably ambiguous provision conditioning the receipt of federal funds by a state be construed in the state's favor. This conclusion seems supported by the logic of *Pennhurst* itself. *Pennhurst* found the imposition of new conditions on the receipt of federal funds repugnant to the notion that by accepting the funds the state had thereby entered into a contract with the federal government and was entitled to have its bargain enforced as written. *Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1539. The present case involves not the imposition of a new condition on the state but the interpretation of the provisions governing the remedies available to the federal government. No principle of contract law re-

quires us to construe such a provision consistently against a federal government obligee. Indeed, in a similar setting, the Supreme Court declined to apply *Pennhurst* to the construction of an arguably ambiguous provision governing the right of the Secretary of Education to recover federal funds that the state had misspent. *Bell v. New Jersey,* 461 U.S. 773, 790 n. 17, 103 S.Ct. 2187, 2197 n. 17, 76 L.Ed.2d 312 (1983).

Whether section 1396b(d)(2) or section 1396b(d)(3) should govern the rate differentials here—or, in other words, whether the Secretary must wait until a state recovers the differentials before she can recover her share from the state—is at least unclear, as the district court believed. Whether the differentials are to be covered under section 1396b(d)(2) or (d)(3) boils down to whether one thinks they are more like those expenses acknowledged to be overpayments, *e.g.,* payments to ineligible recipients, *see Medical Services Administration v. United States,* 590 F.2d 135 (5th Cir.1979), or payments to physicians in excess of ceilings established in the state plan, *see Georgia v. Califano,* 446 F.Supp. 404 (N.D.Ga.1977), or are more like those not recoverable by the Secretary until recovered by the state, *e.g.,* Medicaid payments for services already covered by an insurer, *see* section 1396b(d)(2), second sentence, or payments recovered from a recipient's estate.

Because we find the statutory arguments presented on both sides equally balanced, we turn to considerations of administrative and legislative policy, and here there are at least two reasons to side with the Secretary in this dispute.

■ First, as the question presented here is one concerning which Congress has given no definitive direction, we believe that it is appropriate to attach some weight to an agency's interpretation of a statute that it is responsible for administering, that interpretation being both reasonable and

statutorily permissible.[3] This rule is strengthened where Congress has given the administrator explicit rule-making authority, *see id.*, and where the question presented is more concerned with the efficient administration of a program entrusted to the Secretary than with broad questions of policy. As Judge Breyer stated for this court in the recent case of *Mayburg v. Secretary of HHS*, 740 F.2d 100 (1st Cir.1984),

> [t]he less important the question of law, the more interstitial its character, the more closely related to the everyday administration of the statute and to the agency's (rather than the court's) administrative or substantive expertise, the less likely it is that Congress (would have) "wished" or "expected" the courts to remain indifferent to the agency's views.

(Citations omitted.)

Section 1396b(d)(2), moreover, itself commands that federal grants be reduced "to the extent of any overpayment ... which *the Secretary determines* was made" (emphasis supplied), thus seemingly entrusting the determination of what constitutes an overpayment to the Secretary. Massachusetts argues that 42 U.S.C. § 1302, the rule-making authority relied on by the Secretary, only empowers her to make rules "not inconsistent with this chapter," but since we are unable to say that the Secretary's position is inconsistent with the statute, we do not find that argument persuasive. We believe that with respect to matters of this character, where the statute is not explicit, Congress would have intended the Secretary's construction to be given significant weight.

To be sure, the Secretary's obvious pecuniary stake in this case is bound to heighten our scrutiny of her reading of the statute, but the same interest can be found in most cases involving the federal financial participation provisions of the welfare statutes.

Second, the weight of policy seems to us to fall on the side of the Secretary's interpretation. Since Medicaid is a joint program of the state and federal governments for providing health care, it is appropriate to inquire whether imposing that portion of the rate differential at issue on Massachusetts or the Secretary will better conserve the limited pool of resources available for that purpose. Since only Massachusetts deals directly with the providers, and since the state is empowered to perform on-site audits of these institutions, it is clearly the party best able to minimize the risks resulting from dealing with insolvent providers. The fact that Massachusetts will in any event bear a share of the loss, and so already has some incentive to minimize these risks, diminishes but does not destroy the force of this observation. Placing an additional burden on the state will increase its incentive to take care, whereas the Secretary remains powerless to reduce the risks no matter what the costs imposed on her.

Additionally, we find some force in the Secretary's argument that while the Secretary accepts Massachusetts's retrospective rate-setting scheme, it does not thereby agree to underwrite provider defaults. The latter are an unintended by-product of the scheme, not an explicit expense. The Secretary may reasonably feel that it is more in keeping with sound administration to gear reimbursement to the fair cost of the providers' services—a yardstick more generally applicable in all states, many of which have different systems for determining and reimbursing provider costs.

*The judgment of the district court is reversed. We also direct that judgment now be entered in appeal No. 82–1364.*

---

**3.** *See Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.,* —— U.S. ——, ——, 104 S.Ct. 2778, 2781–84, 81 L.Ed.2d 694 (1984). *Chevron* involved, it is true, a rule-making. But the *Chevron* Court cited in support of its principle *INS v. Jong Ha Wang*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981), a case upholding the INS's interpretation of the Immigration and Naturalization Act in a deportation proceeding. *See Chevron,* —— U.S. at ——, 104 S.Ct. at 2781–84 (citing *Jong Ha Wang*, 450 U.S. at 144, 101 S.Ct. at 1031). Hence we think the principle is also applicable in an adjudicatory setting, as here.