**DEPARTMENT OF SOCIAL SERVICES, DIVISION OF FAMILY SERVICES, Appellee,**

v.

**Otis R. BOWEN,\* Secretary of the Department of Health and Human Services, Carolyne K. Davis, Administrator, and the Health Care Financing Administration, Appellants.**

No. 84–2483.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1985.

Decided Nov. 4, 1986.

\* Otis R. Bowen has been substituted for Margaret M. Heckler, pursuant to Fed.R.App.P. 43(c)(1).

Frances Reddis, Kansas City, Mo., for appellants.

Charles A. Miller, Washington, D.C., for appellee.

Before HEANEY and BOWMAN, Circuit Judges, and WANGELIN,** Senior District Judge.

BOWMAN, Circuit Judge.

This appeal focuses on a dispute between the Department of Health and Human Services (HHS) and the Missouri Department of Social Services (DOSS) over the meaning of "overpayment" under Title XIX of the Social Security Act, 42 U.S.C. § 1396b(d)(2). As a result of a Health Care Financing Administration (HCFA)[1] review of payments made by DOSS before October 1981 to nursing homes participating in the Missouri Medicaid program, HHS identified excessive payments to some of the homes. After notifying DOSS that it considered the excess an "overpayment" under subsection 1396b(d)(2), HHS disallowed federal financial participation to the extent of its share of the "overpayments."

In response, DOSS appealed the decision to the HHS Grant Appeals Board (Board), which upheld the disallowance. The Board concluded that 42 U.S.C. § 1396b(d)(2) empowers HHS to adjust federal funds paid to a state which has made excessive payments to providers of health care services. DOSS then sought judicial review in federal district court, requesting declaratory and in-junctive relief. Ruling on cross motions for summary judgment, the District Court held that the disallowances were unlawful and directed HHS to reinstate DOSS's prior funding level. We reverse.

## I.

In 1965 Congress established the Medical Assistance Program (Medicaid) to help states pay for medical services for the poor. State participation in Medicaid is voluntary, but state programs must meet certain federal requirements before HHS will contribute federal funding. Once approval is secured, the state receives quarterly federal grants approximating the federal share of projected expenses. At the close of each quarter, the state submits to HHS a report of actual expenditures.

Before October 1981, Missouri used an HHS-approved reimbursement plan to pay nursing homes. The state established an annual per diem payment rate based on each nursing home's report of reimbursable costs for the prior year, and then made provisional monthly payments using the estimated rate. Each quarter, HHS paid DOSS in advance for the federal share of the provisional payments. At the end of its fiscal year, each nursing home submitted a cost report and the state readjusted the payment rate based on the actual, allowable costs incurred that year. If the final rate was higher than the interim rate, the state made a supplemental payment to the nursing home. If the final rate was less than the interim rate, the state initiated recovery procedures.

As DOSS collected refunds, it credited the federal share of the refund to HHS on the quarterly report of actual expenditures. However, DOSS did not collect all refunds immediately after calculating the final payment rate.[2] Rather, DOSS gave the nursing homes the option of selecting from

---

** The HONORABLE H. KENNETH WANGELIN, United States Senior District Judge for the Eastern District of Missouri, sitting by designation.

1. HCFA is the HHS agency charged with administering the Medicaid program. We hereinafter use "HHS" to refer to both HHS as a whole and its constituent agency HCFA.

2. This case involves a total of twenty-five nursing homes over the six-year period from 1976 to 1981.

among several installment repayment methods. Some nursing homes chose to contest the rate determination, and several obtained administrative or judicial stays preventing DOSS from collecting. Moreover, a few nursing homes went into bankruptcy or went out of business. Consequently, a portion of the identified refunds remains unpaid to the state, and hence to the federal government.

On three separate occasions, HHS notified DOSS that it was disallowing Medicaid funding equal to the outstanding federal share of the "overpayments" to nursing homes, pursuant to section 1396b(d)(2). The disallowances consisted of the amounts that had been pending for two quarters following the quarter in which DOSS identified the amount as an excessive payment.[3] HHS recovered the disallowances through accounting adjustments that effectively reduced the federal funds available for reimbursing Missouri's future Medicaid expenditures.

The District Court reviewed the statutory language and found that the meaning of "overpayment" was ambiguous. The court considered HHS's interpretation of the statutory language, but declined to give its interpretation controlling significance because the court was of the view that HHS had exceeded its statutory authority. Closely adhering to the reasoning of the district court in *Massachusetts v. Heckler*, 576 F.Supp. 1565 (D.Mass.1984),[4] the District Court concluded that placing the burden of unrecoverable payments on the state would be inconsistent with the general scheme of the Medicaid program.

On appeal, HHS contends that the District Court erred in holding that HHS had no statutory authority to recover from the state the federal share of the excessive nursing home payments. HHS argues that had the District Court applied the correct standard of review, it would have deferred to HHS's view that Title XIX treats such excessive payments as unallowable "overpayments" regardless of whether the state has recovered the excess from the nursing homes. Accordingly, HHS contends that DOSS alone must carry the burden of any uncollectible excess payments under the Missouri Medicaid program.

## II.

This case revolves around a question of statutory construction, a question of law that we may review *de novo*, with appropriate deference to HHS's interpretation of "overpayment." *Brown v. United States Department of Interior*, 679 F.2d 747, 749 (8th Cir.1982). HHS argues that the District Court applied an incorrect standard of review in deciding not to adopt HHS's interpretation of "overpayment." The District Court tested HHS's actions in light of Administrative Procedure Act standards to determine if they were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Rather than concluding that the District Court applied an incorrect standard of review, we conclude that it erred in holding that HHS had exceeded its statutory authority. By so holding, the District Court ended its analysis and did not go on to determine whether HHS's actions were arbitrary or capricious. *See Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Schweiker v. Gray Panthers*, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981).

Recently the Supreme Court, in reviewing an agency interpretation of a statutory provision, said that if a

"statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's

---

3. As of March 31, 1984, the amount HHS claimed was $1,334,130. The amount is subject to change based on DOSS's periodic receipt of refunds, and is not an issue here.

4. The District Court's reliance on *Massachusetts v. Heckler* occurred before the First Circuit reversed that decision, *sub nom. Massachusetts v. Secretary of Health & Human Services*, 749 F.2d 89 (1st Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 3478, 87 L.Ed.2d 613 (1985).

answer is based on a permissible construction of the statute.... [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."

*Young v. Community Nutrition Institute,* —— U.S. ——, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986) (quoting *Chevron U.S.A.,* 467 U.S. at 843–44, 104 S.Ct. at 2782). *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *see also Moore v. Custis,* 736 F.2d 1260, 1262 (8th Cir.1984) (administrative action is arbitrary or capricious only when there is no rational basis for the action).

In *Young,* the Supreme Court noted that the agency's interpretation of a statute the agency is charged with administering is entitled to considerable deference and it need not be the only permissible construction that the agency could have adopted. The agency's view need only be sufficiently rational "to preclude a court from substituting its judgment for that of [the agency]." 106 S.Ct. at 2365 (quoting *Chemical Manufacturers Association v. Natural Resources Defense Council,* 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985)). *See Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); *Blue Cross Association v. Harris,* 622 F.2d 972, 978–79 (8th Cir.1980). Moreover, in *Blue Cross Association,* 622 F.2d at 979, we adopted the Seventh Circuit's view as enunciated in *Health Care Service Corp. v. Califano,* 601 F.2d 934, 935–36 (7th Cir.1979) (per curiam), that "the interpretation of a complex statute such as the Medicare Act by the administrative officer charged with the responsibility of administering it is entitled to considerable deference and, if reasonable, is not to be rejected by a court merely because another interpretation may also be reasonable." *See Gray Panthers,* 453 U.S. at 43–44, 101 S.Ct. at 2640.

### III.

The language of Title XIX is not particularly helpful in determining the meaning of "overpayment" as applied to the present case. Congress used "overpayment" in what are arguably four different contexts within three subsections (42 U.S.C. § 1396b(d)(2), (3), and (5)), but nowhere defined the term. In section 1396b(d), "overpayment" appears twice in subsection (2) and once in subsection (3):

(2) The Secretary shall then pay to the State, in such installments as he may determine, the amount so estimated, reduced or increased to the extent of any *overpayment* or underpayment *which the Secretary determines* was made under this section to such State for any prior quarter and with respect to which adjustment has not already been made under this subsection. Expenditures for which payments were made to the State under subsection (a) of this section shall be treated as an *overpayment* to the extent that the State or local agency administering such plan has been reimbursed for such expenditures by a third party pursuant to the provisions of its plan in compliance with section 1396a(a)(25) of this title.

(3) The pro rata share to which the United States is equitably entitled, *as determined by the Secretary,* of the net amount recovered during any quarter by the State or any political subdivision thereof with respect to medical assistance furnished under the State plan shall be considered an *overpayment* to be adjusted under this subsection.

(emphasis added). In subsection (d)(5), the statute states that "[i]n any case in which the *Secretary estimates* that there has been an *overpayment* under this section to a State on the basis of a claim by such State that has been disallowed by the Secretary," the state has the option of retaining or refunding the contested amount until a final decision is made.

Elsewhere, the statute uses "overpayments" in the context of defining "erroneous excess payments for medical assist-

ance." Such erroneous payments consist of the total of "payments under the State plan with respect to ineligible individuals and families" and *"overpayments* on behalf of eligible individuals and families by reason of error in determining the amount of expenditures for medical care required of an individual or family as a condition of eligibility." 42 U.S.C. § 1396b(u)(1)(D)(i)(I) & (II). For other references to "overpayment," see sections 1396b(q)(5) & 1396m(a), (b), (d) & (e).

In addition, the common or plain meaning of "overpayment" does not help us decide how Congress meant to treat the excess payments at issue. *See, e.g., Webster's Third New International Dictionary* 1609 (1981) (defining "overpayment" as "payment in excess of what is due"). No matter how one parses it, the statutory language simply does not answer the question of *when* excess interim payments to nursing homes become "overpayments" entitling the federal government to recover its share from the state.

HHS and DOSS both make strenuous arguments for their respective positions. These arguments are elaborate. To summarize them would prolong this opinion to no useful purpose. We have carefully considered them. Having done so, we cannot say that either side is plainly right or plainly wrong. It seems to us that both parties have presented us with plausible interpretations of a complex and not unambiguous statute. The deference owed to HHS's interpretation of the statute, however, clear-ly tips the balance in its favor unless there is legislative history showing that the interpretation HHS urges is not the interpretation Congress intended.

Our review of the legislative history of Title XIX, however, convinces us that it sheds little light on the meaning of "overpayment." Apparently, Congress never considered the precise issue before us,[5] so we must turn instead to the general policies underlying Title XIX. The District Court relied on *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), which held that restrictions on federal funding of abortions did not violate the First or Fifth Amendments and that Title XIX does not require states to pay for medically necessary abortions for which federal reimbursement is unavailable. In *McRae,* the Supreme Court noted that "Title XIX is a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons." *Id.* at 308, 100 S.Ct. at 2683. *See Hogan v. Heckler,* 769 F.2d 886, 887–88 (1st Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986). The Supreme Court added that the "cornerstone" of Medicaid is financial contribution by both the federal and state governments. *McRae,* 448 U.S. at 308, 100 S.Ct. at 2683. The Supreme Court's comments were made in the context of its view that Congress designed Title XIX as a cooperative program of shared financial responsibility, not

**5.** We find unpersuasive HHS's suggestion that recent amendments to 42 U.S.C. § 1396b(d) reflect a congressional understanding of "overpayment" that conforms to HHS's position. The Comprehensive Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–272, § 9512, 100 Stat. 82, 212, gives a state 60 days in which to recover or attempt to recover identified overpayments before adjusting federal payments to the state because of the overpayment. No adjustment in FFP is required if the state is unable to collect debts discharged in bankruptcy or otherwise uncollectible. In S.Rep. No. 146, 99th Cong., 1st Sess. 314–15 (1985), *reprinted in* 1986 U.S.Code Cong. & Ad.News 42, 281–82 (No. 3A May 1986), the Budget Committee included a Senate Finance Committee report expressing the view that under "current program administrative in-structions" states must refund the federal share immediately upon discovering the overpayment, even when the debt is uncollectable. The Finance Committee noted that the courts have upheld the administrative instructions. *Id.* However, this report does not state what the proper interpretation of "overpayment" is under subsection 1396b(d). Rather, the report merely states what the current agency practice is, which may or may not conform to the statute. In any event, we only cautiously give weight to statements of a subsequent Congress in ascertaining the meaning of statutes enacted by a prior Congress. *See Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 117–18, 100 S.Ct. 2051, 2060–61, 64 L.Ed.2d 766 (1980). *But see NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974).

as a device for the federal government to compel a state to offer services that Congress was unwilling to fund. *Id.* at 309, 100 S.Ct. at 2684.

In the instant case, the federal government is not abdicating its responsibility to pay legitimate costs under Title XIX. Nor is it compelling the state to provide services that the federal government will not fund. Rather, HHS is seeking to comply with Title XIX's restrictions on reimbursable expenditures and to make the most efficient and effective use of limited federal financial resources. While Congress evidently intended to encourage states to offer necessary medical services to needy individuals, the statutory language defining what services and expenses are allowable, as well as the provisions requiring recoupment of overpayments to states, shows a definite concern that the program be closely restricted to necessary services, efficiently and economically provided. Thus, the general purposes of the statute do not undercut HHS's position in the present case, and we conclude there is nothing in the legislative history or general purposes of the statute that could justify a judicial determination that HHS's position either exceeds its statutory authority or represents an arbitrary and capricious application of that authority.

## IV.

The two circuit courts of appeals that have considered the issue of the meaning of "overpayment" under 42 U.S.C. § 1396b(d)(2) have ruled in favor of HHS. *Perales v. Heckler,* 762 F.2d 226 (2d Cir. 1985), *aff'g* 611 F.Supp. 333 (N.D.N.Y. 1984); *Massachusetts v. Secretary of Health & Human Services,* 749 F.2d 89 (1st Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 3478, 87 L.Ed.2d 613 (1985). As mentioned in footnote 4, *supra,* in *Massachusetts* the First Circuit reversed the decision of the district court, thereby undercutting the District Court's opinion in the present case, which relied upon and adhered closely to the reasoning of the district court in *Massachusetts.*

In these two decisions, the First and Second Circuits have held squarely that HHS is entitled to recover its share of excessive Medicaid payments from states as soon as such excessive payments are identified. In *Massachusetts v. Secretary of Health & Human Services,* the First Circuit concluded that excessive payments to nursing homes are more akin to payments in excess of a state ceiling than to recoveries from a recipient's estate, or from a third-party insurer (second sentence of 42 U.S.C. § 1396b(d)(2)) where the federal government must wait until the state has collected the funds. 749 F.2d at 95. Because Congress had not given definitive directions on this issue, the court accorded weight to HHS's interpretation of the statute. *Id.* at 95–96. Finally, the court stated that policy considerations support HHS's position because the state is in a better position than HHS to insure the financial integrity of a program the state administers. HHS does not actively administer the program, so its ability to reduce the risk of excessive payments is limited. *Id.* at 96. We agree with the First Circuit's deference to HHS's interpretation of the statute and find that court's reasoning persuasive.

In *Perales v. Heckler,* 762 F.2d at 227, the Second Circuit adopted the lower court's reasoning and affirmed its decision holding that the state must return to HHS the federal share of unrecovered overpayments regardless of the state's ability to recoup such overpayments. The district court, 611 F.Supp. at 333, expressed the view that the state is in the best position to guard against fraudulent claims and is therefore obligated to the federal government to assure that all costs for which payments are made are allowable. "There is simply no indication from [the] language [in 42 U.S.C. § 1396b(d)(2) ] that recovery of the federal share is somehow to be made contingent upon the state's prior recovery of any overpayments." *Id.* at 338. The court concluded that under the Medicaid program the state alone may bear the risk of being unable to recover overpayments. *Id.* at 342–43.

We agree with the First and the Second Circuit's resolution of the "overpayment" issue. These two decisions provide strong support for our decision in HHS's favor in the instant case.

### V.

In light of the uncertain meaning of the term "overpayment" in 42 U.S.C. § 1396b(d)(2), and according HHS's statutory interpretation the deference to which it is entitled, we hold that HHS reasonably could read the statute as permitting it to recoup its share of the excessive payments that DOSS made to nursing homes pursuant to an interim payment rate higher than the final payment rate, regardless of whether DOSS has recovered such payments from the nursing homes. Concluding that HHS's action was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, we reverse the judgment of the District Court.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. I would affirm the district court. Its opinion that DOSS is obligated to refund to DHSS its share of the excessive payment only after it receives repayment from the health care provider is in accord with the opinions of Judge Overton of the Eastern District of Arkansas and Judge Garrity of the District of Massachusetts and is consistent with the general scheme of the Medicaid program.

The public assistance programs authorized by the social security act were intended to operate as partnerships between the states and the federal government. *See Harris v. McRae,* 448 U.S. 297, 308, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784 (1980). Medicaid is a cooperative endeavor designed to meet the states' and the federal government's common objective of meeting the basic requirements of needy people for subsistence and health care. *Id.* Sharing costs is fundamental to the Medicaid program:

The cornerstone of Medicaid is financial contribution by *both* the Federal Government and the participating State. Nothing in Title XIX as originally enacted, or in its legislative history, suggests that Congress intended to require a participating State to assume the full costs of providing any health services in its Medicaid plan. Quite the contrary, the purpose of Congress in enacting Title XIX was to provide federal financial assistance *for all legitimate state expenditures under an approved Medicaid plan.*

*Harris v. McRae,* 448 U.S. 297, 308, 100 S.Ct. 2671, 2684, 65 L.Ed.2d 784 (1980) (emphasis added).

In my view, placing the entire financial burden of these unrecoverable Medicaid payments on the State of Missouri frustrates the policies of the Medicaid program, unfairly straps Missouri's limited resources, and is based on an inaccurate interpretation of the law. No one asserts that the state has been derelict in its duty nor could they. This is simply a case of HHS unfairly using its position as interpreter of the law in its own self-interest to shift the entire responsibility for excess payments to the State of Missouri. The district court's opinion is consistent with the statute and should be affirmed.