**STATE of WISCONSIN, DEPARTMENT of HEALTH and SOCIAL SERVICES, Plaintiff-Appellee,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant-Appellant.**

No. 85–1207.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1985.

Decided July 21, 1986.

**392**

Laurence Gilbert, Asst. Regional Atty., Dept. of Health and Human Services, Chicago, Ill., for defendant-appellant.

Jody Melms, Wisconsin Dept. of Justice, Madison, Wis., for plaintiff-appellee.

Before CUDAHY, ESCHBACH, and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

We are asked in this appeal to decide whether the Secretary of Health and Human Services (the "Secretary") abused his discretion by interpreting the "utilization control" provisions of the Medicaid statute, 42 U.S.C. §§ 1396a(a)(30), 1396b(g)(1), and accompanying regulations, 42 C.F.R. Parts 442 & 456, in an arbitrary and capricious manner.[1] The district court ruled that he had and remanded the case to the HHS Grant Appeals Board. We reverse.

I.

Medicaid, a cooperative federal-state program established by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, provides federal financial assistance to those states that choose to reimburse health care providers for certain costs of medical care given to needy persons. A state need not participate in Medicaid, but if it chooses to accept federal funds it must comply with the federal Medicaid statute and regulations, including the requirement that a state plan, describing the state's program and assuring conformity with federal prescriptions, be submitted for approval by the Secretary. 42 U.S.C. § 1396a(b).

A state plan must provide for patient care in "skilled nursing facilities" (SNFs), 42 U.S.C. §§ 1396d(a)(4)(A); it may also at its option provide for care in "intermediate care facilities" (ICFs), 42 U.S.C. § 1396d(a)(15). A SNF is appropriate for patients who require constant care and the services of skilled nursing or rehabilitation personnel, 42 U.S.C. § 1396d(f); 42 C.F.R. § 440.40; an ICF provides a lower level of services for patients who nonetheless require institutional care, 42 U.S.C. § 1396d(c); 42 C.F.R. § 440.150. Both sorts of facilities must be licensed by the state and certified by the state Medicaid

---

**1.** The utilization control provisions of the Medicaid statute were amended by the Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 2363, 98 Stat. 1105–07. *See infra* note 2.

Since this appeal involves disallowances taken in 1982 and 1983, this opinion will analyze all issues under the old statutory scheme.

agency as conforming to federal requirements. 42 C.F.R. §§ 442.12, 442.200–202, 442.250–254.

Services provided in SNFs and ICFs are subject to Medicaid's "utilization control" requirements. Section 1902(a)(30) of the statute, 42 U.S.C. § 1396a(a)(30), requires that

[a] State plan for medical assistance ... provide such methods and procedures relating to the utilization of, and the payment for, care and services ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy and quality of care.

Towards this end, each state must demonstrate to the Secretary that it has an "effective program" of utilization control. Such a program should ensure *inter alia* that whenever a Medicaid patient is admitted to a nursing home or hospital "a physician certifies ... [and] recertifies, where such services are furnished over a period of time ... at least every 60 days ... that such services are or were required to be given on an inpatient basis because the individual needs or needed such services...." 42 U.S.C. § 1396b(g)(1)(A) (1983).[2] If a state cannot make this demonstration, federal reimbursement for that quarter, called the federal medical assistance percentage (FMAP), is decreased according to a statutory formula. 42 U.S.C. § 1396b(g)(1). The

Health Care Financing Administration (HCFA), an agency within HHS, periodically checks a state's utilization control showing and, if it determines that a state is not in compliance, imposes as a penalty a reduction in FMAP. 42 U.S.C. §§ 1396b(g)(2), 1396b(g)(5).

In June 1982, March 1983 and September 1983 the HCFA surveyed the utilization control performance of the Wisconsin Department of Health and Social Services (Wisconsin) for the quarters ending March 1982, December 1982 and June 1983 and determined that Wisconsin was not in compliance with federal requirements. In each of the three surveys, the HCFA examined state records and found that a number of ICFs were treating at least one Medicaid patient certified for SNF care.[3] In the second survey, the HCFA found that two SNFs were providing Medicaid services to patients certified as needing only ICF care. HCFA therefore disallowed a portion of Wisconsin's FMAP for the relevant quarters, on grounds that Wisconsin did not have an effective program of utilization control.[4]

Wisconsin appealed each of these disallowances to the HHS Grant Appeals Board separately. In the first administrative proceeding, the Board issued a decision upholding the federal disallowance. In the two subsequent proceedings, Wisconsin relied solely upon the arguments it had

---

**2.** Prior to 1984, the utilization control provisions required both this recertification process and various forms of medical review of hospital and nursing home patients and facilities. *See* 42 U.S.C. §§ 1396b(g)(1)(A)–(D) (1983). The 1984 amendments removed the recertification requirement from the utilization control section and recodified it at 42 U.S.C. §§ 1396a(a)(30)(B) and 1396a(a)(44) so that "[t]he physician recertification requirements for both SNF and ICF patients would become State Medicaid plan requirements." H.Conf.Rep. No. 861, 98th Cong., 2d Sess. 1363 (1984), *reprinted in* [1984] U.S. Code Cong. & Ad.News 697, 2051. This means that the penalties prescribed for utilization control violations no longer apply to recertifications but rather only to medical review of facilities. However, a state that failed to recertify patients would now be subject to administrative sanctions for failure to comply with the requirements of a state plan.

**3.** After the June 1982 survey, the HCFA contended that during the relevant quarter six ICFs had treated patients certified for SNF care. After Wisconsin submitted evidence that one of the patients in question had died before that quarter began, the HCFA reduced the disallowance to reflect five noncomplying ICFs. The March 1983 and September 1983 surveys both discovered SNF patients in ICFs as well.

**4.** The disallowances were as follows:

| | |
|---|---|
| June 1982 | $ 112,640.59 |
| March 1983 | $ 166,959.01 |
| September 1983 | $ 124,630.63 |

HCFA computed these disallowances according to the statutory formula. *See* 42 U.S.C. § 1396b(g)(5).

briefed for the first, and the Board also upheld these disallowances, incorporating its reasoning from the first decision.

Wisconsin's position before the Board was that it did have an effective program of utilization control, as defined by Medicaid and the federal regulations, because the state had approved a system of "variances," under which a SNF-certified patient might remain in an ICF, or an ICF-certified patient in a SNF, upon a request from and supporting materials submitted by a patient's family, physician, the facility administrator and a state evaluator.[5] It argued that the primary goal of utilization control is cost efficiency and that the Secretary's authority over placement decisions is limited to that aspect of patient placement. Since it actually saves money to keep SNF-certified patients in ICFs, which charge less for services,[6] Wisconsin asserted, the variance program complied with Medicaid utilization control requirements. In the alternative, Wisconsin argued that its variance program was in the best medical interest of the patients because of the risk that a patient might suffer "transfer trauma," that is, "trauma brought about by being separated from a spouse residing in the same facility and not needing the different level of care, or by being removed from familiar surroundings after living for a

length of time in a particular facility." Appellee's Brief at 6. Wisconsin did not present any medical evidence supporting the existence of "transfer trauma," instead relying on judicial recognition of the phenomenon. See Appellant's Brief, *Wisconsin Department of Health and Social Services*, No. 83–20 (Grant Appeals Board November 30, 1983), at 6.

The HCFA contended that a state variance system was irrelevant to the question of compliance with federal law because the Secretary had interpreted the statute and regulations as justifying a prophylactic rule that SNF-certified patients be treated only in SNFs and ICF-certified patients only in ICFs. It argued that the Secretary had the discretion to read the statute and regulations in this way because the utilization control provisions have a dual purpose—saving money and ensuring quality of care. Allowing SNF-certified patients to remain in ICFs jeopardizes quality of care. And allowing ICF-certified patients to remain in SNFs, which charge higher rates, is not cost efficient. Finally, the HCFA argued that Wisconsin had notice of the Secretary's interpretation of the recertification requirement through two "action transmittals," sent to state Medicaid agencies to clarify the matter. See HCFA, Medicaid Action Transmittal No. 75–122

---

5. Wisconsin described its variance procedure in its brief to the Grant Appeals Board as follows:

In order to insure that the patient will receive adequate treatment and that allowing an SNF-certified recipient to remain in an intermediate care facility will not diminish the care of the other residents, the following information must be supplied to the Wisconsin Department of Health and Social Services before a variance is granted:

(1) Statement from the administrator indicating that he/she will assume responsibility for the resident, how care will be *enhanced* if variance is granted and how care of other residents will not be diminished.

(2) Statement from the attending physician endorsing the resident in remaining at the facility without detriment to the individual resident's physical and mental health, and willingness of the physician to assume responsibility for care of the resident.

(3) Statement from the guardian or concerned relative (if any) requesting that the resident remain in the facility.

The above three [statements] are then reviewed by the State's registered nurse and social worker surveyor staff and, based on their knowledge of the home, they make a recommendation as to whether the facility can provide appropriate care. If a variance is granted based on the procedure outlined above, the variance is limited to the specific resident for a specific period of time.

Appellant's Brief, *Wisconsin Department of Health and Social Services*, No. 83–20 (Grant Appeals Board November 30, 1983), at 7 (emphasis in original).

6. Wisconsin states in its brief to this court that the 1983 average daily rate per patient was $47.00 in a SNF and $36.00 in an ICF. It therefore estimates that each variance allowing a SNF-certified patient to remain in an ICF saves $4,000 annually. Appellant's Brief, *Wisconsin Department of Health and Social Services, supra*, at 5–6.

(November 1975); HCFA, Medicaid Action Transmittal No. 80–68 (September 1980); *infra* note 9. The Board agreed with the HCFA and ruled that the variances did not cure the state's lack of compliance; in dicta, it expressed doubt about whether Wisconsin had in fact followed its own variance system in each case.

The three cases were consolidated for review by the district court, which reversed the Grant Appeals Board. It found that, in administering the utilization control provisions of Medicaid, "the Secretary's concern should be primarily focused on financial rather than medical matters," *Wisconsin Department of Health and Social Services v. Heckler*, Nos. 84–C–75–S, 84–C–334–S, 84–C–682–S (W.D.Wis. December 11, 1984), at 9–10, and that "in penalizing the State for a nursing home placement decision based on patient treatment considerations, the Secretary is overstepping the boundary between Federal and State responsibility that has been understood since the institution of this program," *id.* at 7. It noted that Wisconsin defended the legitimacy of its variances on the basis of transfer trauma, which it ruled had "enough logical force" to

> justify requiring the Secretary to point to more specific legislative authorization for rejecting the State's position than she has shown. It would seem rational and reasonable to suggest that, at the margin between the arbitrary line separating patients who belong in facilities denominated ICF's from those who belong in SNF's, transfer trauma may provide sufficient justification to grant a variance for legitimate medical reasons. The State's policy has the added benefit of

saving both State and Federal dollars which ... is the primary purpose of the very statutes and regulations on which the Secretary depends for her decision in this matter.

*Id.* at 6–7. Because there was insufficient evidence before it to rule on the question of transfer trauma, the district court remanded the case to the Board for fact-finding. The Secretary has appealed from this order.

## II.

In his appeal to this court, the Secretary contends that the district court erred in three different aspects of its analysis: (1) in finding that the Secretary lacks the statutory authority to address quality of care concerns arising out of nursing home placement; (2) in shifting the burden to the Secretary to prove that his interpretation of the utilization control provisions was *more* reasonable than Wisconsin's; and (3) in concentrating only on the placement of SNF-certified patients in ICFs and ignoring Wisconsin's other purported violation, the retention of ICF-certified patients in SNFs.[7] We will address each of these in turn.

## A.

In 1967 Congress added to Title XI of the Social Security Act a voluntary program of federal financial participation in vendor payments to "intermediate care facilities" on behalf of institutionalized beneficiaries of the categorical assistance programs for the aged, the blind and the disabled. Pub.L. No. 90–248, § 250, 81 Stat. 821 (1967). At that time, Medicaid offered unlimited federal matching funds for those

---

**7.** The Secretary also finds error in the district court's having given Wisconsin "two bites at the administrative apple" by remanding for further fact-finding when Wisconsin had failed to produce evidence of either transfer trauma or the regularity of the variances it had issued to nursing home patients. Appellant's Brief at 43. Because we find that the Secretary's interpretation of the utilization control provisions is reasonable and should be upheld, we need not address this argument. We note, however, that judicial review of agency fact-finding is limited to evidence on the record below and that Wisconsin presented no medical evidence to support the existence of transfer trauma.

We also need not discuss the Secretary's contention that the Wisconsin variance procedure was in violation of the Wisconsin state Medicaid plan. This argument is subsumed in the question of the proper interpretation of the utilization control provisions because Wisconsin has adopted these provisions as part of its state plan.

recipients in SNFs; if an eligible recipient was receiving a less intensive level of care, Medicaid would not cover his expenses and a much heavier financial burden fell onto the state. Congress was concerned that this led the states to retain in SNFs patients who did not need the more sophisticated (and more expensive) care a SNF provided. *See* S.Rep. No. 744, 90th Cong., 1st Sess. (1967), *reprinted in* [1967] U.S. Code Cong. & Ad. News, 2834, 3026–27.

However, many states did not accept this 1967 invitation to set up intermediate care programs under Title XI, so in 1971 Congress moved the authorization for ICF reimbursement into the Medicaid statute. Now Medicaid would reimburse both SNF and ICFs for caring for Medicaid-eligible patients. Pub.L. No. 92–223, § 4, 85 Stat. 802. *See* H.R.Rep. No. 231, 92d Cong., 1st Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Ad. News, 4989, 5097–98. The next Congress enacted the utilization control requirements, Pub.L. No. 92–603, § 207, 86 Stat. 1329, the purpose and scope of which are at issue here.

The district court agreed with Wisconsin's contention that the federal interest in—and therefore the Secretary's authority in the enforcement of—the utilization control provisions was limited to fiscal concerns. It stressed that Congress in amending Title XIX in 1972 to allow Medicaid reimbursement for intermediate care evinced a great interest in saving federal money. As the preceding history shows, we cannot disagree that Congress in 1972 was concerned with an inefficient use of federal funds and wished by reimbursing ICFs through Medicaid to save money. But it does not follow that merely because cost efficiency is a goal of a program—or even, as the district court found, the "primary" goal—Congress was not concerned about the quality of care each patient

would receive: "[Intermediate care] was not intended as a placement device whereby States could reduce costs through wholesale and indiscriminate transfer of patients from skilled nursing homes to intermediate care without careful and independent medical review of each patient's health care needs." H.R.Rep. No. 231, 92d Cong., 1st Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Ad. News 5097.

█ The language of the 1972 utilization control addition suggests a dual federal concern: a state plan must address "*utilization of,* and payment for, *care and services* ... to safeguard against unnecessary utilization of such care and services and *to assure that payments are consistent with* efficiency, economy, and *quality of care.*" 42 U.S.C. § 1396a(a)(30) (emphasis added). Utilization control, as mandated by Congress, clearly speaks not only to the utilization of federal funds, as the district court ruled, but also to the utilization of medical care and services. Further, the utilization control requirements as elaborated at 42 U.S.C. § 1396b(g)(1) buttress this conclusion. Besides requiring the periodic recertification of appropriate level of care, 42 U.S.C. § 1396b(g)(1)(A), an "effective program of utilization control" also requires written patient "plans of care," periodically reviewed by a physician, § 1396b(g)(1)(B); a continuous program of utilization review under which the admission or continued stay of patients is evaluated by "medical and other professional personnel ... not directly responsible for the care of the patient involved ...," § 1396b(a)(1)(C); and annual independent professional reviews of each case, § 1396b(g)(1)(D), to examine "with respect to each of the patients receiving care, the adequacy of the services ... to meet current health needs and promote maximum physical well-being," § 1396a(a)(26).[8] As

---

**8.** We are further convinced of this result by a 1984 amendment to this section of the Act. New section 1396b(g)(7) reads:

It is the duty and the responsibility of the Secretary to assure that standards which govern the provision of care in skilled nursing facilities and intermediate care facilities under plans approved under this subchapter, and the enforcement of such standards, are adequate to protect the health and safety of residents and to promote the effective and efficient use of public money.

The legislative history indicates that this further articulation of the dual federal concerns—

the Tenth Circuit commented recently, in ruling on the Secretary's duties under Medicaid's "look-behind" provisions, 42 U.S.C. § 1396a(a)(33), "the federal government has more than a passive role in handing out money to the states.... The Secretary must insure that states comply with the congressional mandate to provide high quality medical care." *Estate of Smith v. Heckler,* 747 F.2d 583, 589–90 (10th Cir. 1984). Thus, we hold that the Secretary may, in administering the utilization control provisions of Medicaid, consider quality of care as well as cost efficiency without abusing his discretion or overstepping the bounds of federal responsibility.

### B.

Given that quality of care as well as cost efficiency is a valid concern of the Secretary in this context, it remains to examine whether he abused his discretion in interpreting the utilization control requirements as he did.

 Basic principles of administrative law limit the scope of a court's review of agency action. An agency's interpretation of the statute it is charged to administer is "entitled to a presumption of regularity," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and may not be disturbed unless it is "arbitrary, capricious, or constitute[s] an abuse of discretion," *id.* at 416, 91 S.Ct. at 823; *St. Mary of Nazareth Hospital Center v. Department of Health and Human Services,* 698 F.2d 1337, 1346 (7th Cir.1983). The district court rejected the Secretary's contention that his interpretation warranted "legislative effect" because, with the extremely complex Medicaid scheme, "Congress entrusts to the Secretary rather than to the courts the primary responsibility for interpreting" the statute in question. *See Schweiker v. Gray Panthers,* 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981) (quoting *Batterton v. Francis,* 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53

L.Ed.2d 448 (1977)). The district court was correct in refusing to give the Secretary's interpretation here "legislative effect"— this case, unlike *Schweiker* and *Batterton,* does not involve regulations promulgated, upon an express delegation from Congress, by formal rulemaking. But the district court was still bound to defer to his interpretation if reasonable and statutorily permissible. *See, e.g., Commonwealth of Massachusetts v. Department of Health and Human Services,* 749 F.2d 89, 95–96 (1st Cir.1984). This, we feel, the district court did not do and its failure constituted error.

The statutory utilization control language requires that a state show, through periodic recertification, that "services are or were required to be given on an inpatient basis because the individual needs or needed such services...." 42 U.S.C. § 1396b(g)(1)(A). The regulations addressing recertification of patients in ICFs requires that "[a] physician ... must recertify for each ... recipient that ICF services are needed." 42 C.F.R. § 456.360(b). Wisconsin reads these provisions together as requiring only that a patient need *at least* the level of care for which he is certified; that is, it argues that a SNF-certified patient can be placed in an ICF because the patient demonstrably needs that level of services. This would comport with the federal interest because it would be less expensive than SNF placement. The state would assume the responsibility for making "arrangements to attend to the patient's changed medical needs." Appellee's Brief at 16. Wisconsin appears to agree that such a patient might not be ideally suited medically for an ICF but it wishes to reserve the right to make the medical decision as to placement and any necessary special arrangements itself:

No federal Medicaid law or regulation mandates automatic transfer from an ICF to an SNF upon skilled care recertification, or a transfer from an SNF to an ICF upon intermediate care recertifica-

quality of care and cost efficiency—"reaffirms the Secretary's existing duty." H.Conf.Rep. No.

861, 98th Cong., 2d Sess. (1984), *reprinted in* [1984] U.S.Code Cong. & Ad.News 1357.

tion, and no law or regulation prohibits the State from carefully reviewing the facts surrounding a recertification to determine whether a patient's interests might best be served by granting a variance and allowing the patient to remain in a particular facility subject to the conditions imposed by the State. All that [the regulations] require is that patients be recertified periodically and that the State make a showing that such recertifications have occurred.

Appellee's Brief at 15.[9]

■■■ The Secretary, however, has interpreted these same provisions differently and more strictly, as requiring that SNF-certified patients be admitted to and retained in SNFs only and that ICF-certified patients be admitted to and retained in ICFs only. He has made that interpretation in two action transmittals. HCFA, Medicaid Action Transmittal No. 75–122 (November 1975); HCFA, Medicaid Action Transmittal No. 80–68 (September 1980).[10] An action transmittal is an interpretative publication of the HCFA. It does not create law but rather contains an agency's interpretation of the law it is charged to administer. *Colorado Department of Social Services v. Department of Health and Human Services,* 558 F.Supp. 337, 352, 353 (D.Colo.1983); *Seniors United for Action v. Ray,* 529 F.Supp. 55, 60 n. 2 (N.D.Iowa 1981). Mindful that our review is limited

to whether the Secretary's position is reasonable, and venturing no opinion as to Wisconsin's interpretation or the legal or medical significance of transfer trauma, we hold that the Secretary's interpretation is a rational attempt to balance the cost efficiency and quality of care concerns of the federal government and is fully compatible with the statute, regulations and legislative history. We are by no means insensitive to Wisconsin's concern with transfer trauma, but, as our analysis suggests, where federal aid is at issue, Wisconsin must persuade federal authorities at an appropriate time and in an appropriate forum of the soundness of its point of view on this medical question. As noted, Wisconsin did not present evidence on this question at the proceedings before the HHS Grant Appeals Board in the instant matter.

The language of sections 1396a(a)(30) and 1396b(g)(1)(A), *see supra,* while not overly specific, is certainly susceptible to the interpretation the Secretary has given it, and his reading of the regulations that implement those sections is less strained than Wisconsin's. The regulation governing recertification of patients in ICFs requires that "[a] physician ... recertify for each ... recipient that ICF services are needed." 42 C.F.R. § 456.360(b), and defines ICF services as "those services furnished in an intermediate care facility."

---

**9.** Wisconsin does not rely upon the argument, made in the dissenting opinion, that the Secretary's interpretive rule "bypasses [Medicaid's] utilization review system for conducting extended care review." As the variance system here at issue operates without regard to any of the federally-imposed cost control provisions, we do not find utilization review relevant to the question before us either.

**10.** Both action transmittals defined recertification: "the process by which a physician attests to an individual's need for continued placement at a specified level of care." The 1980 transmittal, issued as a "clarification of what constitutes a valid recertification," further cautioned that "[a] recertification will only be acceptable if it evidences the physician's determination that continual care is required at a particular level ...."

 Wisconsin argues that nothing in the wording of either transmittal precludes it from certifying

a patient for a specified level of care and then placing that patient in a different level of care. *See* Appellee's Brief at 16. We do not think that Wisconsin is reading the transmittals reasonably. Although the district court, too, read the transmittals as merely "an instruction to insure that persons no longer qualifying for Medicaid services do not remain in a facility," *Wisconsin Department of Health and Social Services v. Heckler, supra,* at 12, this does not explain the requirement that a physician find the need for continued institutionalization at a *specified level of care.* There would appear to be no reason to require a specified level of care if the specification of that level were to be completely irrelevant to the ultimate patient placement decision. Thus, although we think that the HCFA might endeavor to be plainer in its instructions to the states, we also believe that Wisconsin was reasonably on notice as to the import of the action transmittals.

*Id.* § 456.351. It is reasonable that a recipient certified to receive services that are furnished in an ICF facility should be treated in one. SNF services are defined as "daily skilled services ... that, as a practical matter, can only be provided in a SNF...." *Id.* § 409.31. It also seems quite reasonable that a recipient certified to receive services that can only be provided in a SNF ought to be treated in a SNF, not in an ICF. The general structure of the statute and regulations further suggests a distinction between ICF and SNF services that was not to be obliterated at a state's pleasure: the exhaustive requirements for facility certification as a SNF, *see* 42 U.S.C. §§ 1396a(a)(28), 1395x(j), would lose their meaning if a state were free to place SNF-certified patients in ICFs.

Finally, we note that the legislative history also supports the Secretary's position. The legislative history of the 1967 addition of ICF services to Title XI states that the bill would provide reimbursement for "individuals whose condition does not require care in a skilled nursing home...." H.Conf.Rep. No. 1030, 90th Cong., 1st Sess. (1967), *reprinted in* [1967] U.S.Code Cong. & Ad. News 3216. The history of the bill that added utilization control to Medicaid explained that intermediate care is for persons "who require care ... up to, *but not including,* the skilled nursing home level." H.R.Rep. No. 321, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Ad. News. 5097 (emphasis added). Congress obviously meant for appropriateness as well as cost of care to be a federal issue, *see supra,* and clearly viewed placement as a matter not to be relegated solely to state discretion.

Wisconsin argues that such a regime is arbitrary and capricious because it "completely undercuts the physician's judgment," stressing that "[t]he physician certification and recertification requirement is based on the concept that the physician is a key figure in determining appropriate utilization of health services." Appellee's Brief at 17 (quoting 45 Fed.Reg. 48,558 (1981)). This argument ignores the fact that the Secretary has created a prophylactic interpretive rule which treats the physician's determination as the sole and decisive factor.[11] The variance process also involves the physician's judgment, at a later date, but there is no reason to believe that the physician's second decision should be treated as more sound than his first.

■ Further, the fact that this is a prophylactic rule, and may not provide the optimal result in some small number of cases, does not make it arbitrary and capricious. *See Schweiker v. Gray Panthers,* 453 U.S. at 48, 101 S.Ct. at 2642 ("The administration of public assistance based on a formula is not inherently arbitrary."); *cf. Weinberger v. Salfi,* 422 U.S. 749, 777, 95 S.Ct. 2457, 2472, 45 L.Ed.2d 522 (1975) (Congress could establish prophylactic rule in social security statute for a legitimate purpose and in situations where "the expenses and other difficulties of individual determinations justified the inherent imprecision" of the rule).

### C.

Up to now, we have been concentrating on the district court's treatment of the issues raised by the retention of SNF-certified patients in ICFs. We now turn briefly to the issues raised by Wisconsin's retention of ICF-certified patients in SNFs. As might be expected, the considerations are similar but their significance quite different. Thus, we believe that the district court erred in failing to discuss separately the disallowances resulting from the HCFA's discovery of ICF patients in SNFs.

---

**11.** The dissent mistakenly states that patients are moved between levels of care based on the decisions of physicians' assistants and nurse-practitioners. Such paramedic personnel may make a recertification decision, 42 C.F.R. § 456.260, but a transfer of a patient between levels of care is treated as a new admission and requires a physician's certification, not a recertification, as the dissent suggests. State Medicaid Manual § 9215, reprinted in Medicare and Medicaid Guide (CCH) ¶ 14,729 (1984).

When a patient is kept in a facility that provides services more intensive than his condition demands, questions of cost efficiency come to the fore and those of quality of care recede. Yet in its second appeal to the Grant Appeals Board (the only appeal raising this issue), Wisconsin relied solely upon the brief it had submitted for the first appeal (which had dealt only with SNF patients in ICFs). The Board found against Wisconsin, stating:

> [T]he State's argument concerning the cost efficiency of retaining SNF patients in the presumably lower cost ICFs is neither applicable or persuasive here.... There is no evidence showing that retaining intermediate care patients in SNFs was cost efficient. At best, the cost was the same because the State paid the lower ICF rates; at worst, the cost was higher because the State continued to pay higher SNF rates.... Arguably, the patients needing intermediate care who were in SNFs were receiving the medical care they needed. However, this is not dispositive of the question whether there were utilization control violations.... It is axiomatic that when a patient needing intermediate care is in a SNF, the patient either receives excessive services or does not make full use of the services that the facility can provide.

*Wisconsin Department of Social Services,* No. 83–229 (Grant Appeals Board March 30, 1984). The Board was correct in its ruling. The Secretary's authority to regulate nursing home placement to the end of cost efficiency has been unquestioned throughout this litigation. Wisconsin failed even to advance arguments why these disallowances should not be affirmed.

For all of the foregoing reasons the judgment of the district court is REVERSED.

COFFEY, Circuit Judge, dissenting.

The majority holds that the United States Secretary of Health and Human Services's

("Secretary")[1] duty to ensure the quality of health care given to Medicaid recipients in nursing homes authorized the Secretary's rule mandating that "Medicaid patients who are certified by their physicians as needing the skilled level of care be treated only in facilities qualified as 'skilled nursing facilities' and those patients certified by their physicians as needing only the intermediate level of care are treated in facilities qualified as 'intermediate care facilities.'" I cannot support the majority's unfounded leap from the premise that the Secretary is obligated to assure quality of care to the conclusion that patients must automatically be transferred based upon a recertification of level of care needed, performed during the utilization review process, without regard to the patient's attending physician's or the Utilization Review Committee's medical judgment of whether the transfer would be detrimental to the patient's health. The majority stifles any inquiry into the often life-determining question of transfer trauma. The majority, without the benefit of a medical education, much less the obligations of the Hippocratic Oath, strangles the judgment and medical decisions of the treating physicians concerning quality and proper health care. They do this under the guise of answering a question of statutory interpretation. The majority opinion fails to acknowledge the system for quality of care assurance enacted in the Medicaid statute and, consequently, fail to comprehend that the Secretary's rule mandating automatic transfer of nursing home patients (in effect, a determination by the Secretary that continued stay in the facility is no longer medically indicated based upon the recertification of the level of care needed) undermines the statutory scheme in that it circumvents the continued stay review process mandated in the Medicaid regulations. Furthermore, the majority fails to realize that the Secretary's mandatory transfer rule is an improper intrusion into the attending physician's medi-

---

**1.** To avoid confusing the United States Secretary of Health and Human Services with the Wisconsin Secretary of Health and Social Services, the federal Secretary will be referred to as "the Secretary" or "the Secretary of Health and Human Services." The Wisconsin Secretary of Health and Social Services will be denoted as "Wisconsin."

cal judgment. The net result of the majority's endorsement of the Secretary's rigid automatic transfer rule is the often cruel and heartless transfer of nursing home patients in direct contradiction of the attending physician's medical judgment that such a transfer would endanger the patient's health and may very well be fatal. I dissent.

### I.

#### A. Quality Assurance Under Medicaid

Because the majority is apparently unaware of the quality of care scheme of Medicaid, or refuses to accept it, it is necessary that we review the history and structure of the Medicaid quality of care system. Utilization review became mandatory in 1965 with the passage of the Medicare Act (42 U.S.C. § 1395 et seq.), making hospital-based Utilization Review Committees an integral part of the Medicare program and a requirement for hospitals to participate in the Medicare program. "The function of a hospital Utilization Review Committee is 'to minimize the cost of patient care by monitoring the use of the hospital and its resources, primarily so that excess usage (and cost) is prevented....' " Blum, Gertman & Rabinow, PSROs and the Law, Ch. 1 at 5 (1977) (hereinafter Blum). In "concurrent review," the form of review at issue in this case,[2] the need for inpatient care is assessed while the patient is hospitalized. A "review coordinator," a non-physician operating under the supervision of a physician, assigns a specific time period to the patient's hospital stay ("length-of-stay-determination") based upon the patient's age, diagnosis, and regional norms. *Id.* at 6. The review coordinator is also responsible for assessing the patient's progress. *Id.* at 7. Before the initial confinement period expires (usually two days before the expiration date), the review coordinator, a layman, examines the pa-

tient's record, using criteria established by the Utilization Review Committee for the diagnosis in question, to determine whether additional hospitalization is needed. *Id.* If the review coordinator declines to approve the extended stay, the case is referred to the coordinator's supervising physician. *Id.* If the supervising physician also determines that an extended stay is unwarranted, he may consult the attending physician. *Id.* If the attending physician fails to persuade the supervising physician of the necessity of the extended stay, the physician or the patient may appeal to the Utilization Review Committee ("composed of two or more physicians, with or without participation of other professional personnel," *id.* at 3). *Id.* at 6–7. If the Utilization Review Committee approves the extended stay, a new length-of-stay is assigned and the re-certification process is repeated. *Id.* at 7. repeated. *Id.* at ——.

The Medicare statute required hospitals to perform extended stay reviews to reduce costs. *Id.* at 4.

> "Extended stay review ... was designed to prevent lengthy hospital stays that represented the greatest cost strain on the system. Thus the federal government attempted to build into a costly system a method to economize in the area of greatest abuse, which was felt to be extended stay."

*Id.* Central to this utilization review program was Congress' decision that the medical professionals on the Utilization Review Committee were to make the final judgment on the medical necessity of care provided to Medicare beneficiaries. *Id.* Indeed, the Medicare statute expressly provides that the federal government shall not interfere with the practice of medicine:

> "Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services

---

**2.** Utilization review may take three forms: (1) prospective (preadmission certification by the review coordinator of the need for admission); (2) concurrent (the review coordinator's review of the need for inpatient care while the patient

is in the hospital); and, (3) retrospective (post-discharge review by the utilization review committee of the medical necessity and appropriateness of the care given to the patient). *Id.* at 6–8.

are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person."

42 U.S.C. § 1395.

In 1967, Congress amended the Social Security Act and required state Medicaid agencies to establish utilization review procedures for all care and services provided under Medicaid Medical Assistance Plans. (PL 90–248). The Department of Health, Education and Welfare authorized fiscal intermediaries[3] to institute retrospective review of the medical necessity of the care provided in specific cases and to deny payment when, in the opinion of the fiscal intermediary, the care was not medically necessary. Blum, ch. 1 at 11. Because the Secretary authorized retrospective review by the fiscal intermediary, the final and ultimate authority to determine medical necessity rested with the fiscal intermediary and the Utilization Review Committee's determination of medical necessity during concurrent review was but one factor to be considered. *Id.*

The combination of Utilization Review Committees and fiscal intermediaries proved to be less than successful. S.Rep. No. 1230, 92nd Cong., 2d Sess. 254–69 (1972). Specifically, Congress determined that fiscal intermediaries' review of medical necessity was neither accurate nor appropriate.

"Apart from the problems experienced in connection with their determination of 'reasonable' charges, the performance of the carriers responsible for payment for physician's services under Medicare has also varied widely in terms of evaluating the medical necessity and appropriateness of such services. Moreover, ever since Medicare began, physicians have expressed resentment that their medical determinations are challenged by insurance company personnel. The committee has concluded that the present system of assuring proper utilization of institutional and physician's services is basically inadequate. The blame must be shared between failings in the statutory requirements and the willingness and capacity of those responsible for implementing what is required by present law.

\* \* \* \* \* \*

*The committee believes that the review process should be based upon the premise that only physicians are, in general, qualified to judge whether services ordered by other physicians are necessary.* The committee is aware of the increasing instances of criticism directed at the use of insurance company personnel and Government employees in reviewing the medically necessity of services."

*Id.* at 256 (emphasis added). To correct these problems, Congress adopted a system placing the responsibility for reviewing the utilization of services in the hands of practicing physicians and surgeons. *Id.* at 257.

"An effective comprehensive professional review mechanism can materially ease problems of utilization and quality control. This is the area where a bridge was needed between medicine and Government. It was all too clear to those of us on the Finance Committee that an army of Government and insurance company employees checking on each medical service was not the answer. *Past experience and common sense indicated clearly that clerical personnel could not and should not make decisions as to the quality and necessity of medical services.*

The bridge we needed between Government and medicine was a structure through which practicing physicians could, in an organized and publicly accountable fashion, professionally evaluate the quality and necessity of medical services in an area."

---

**3.** A fiscal intermediary, usually an insurance company, is an entity that the Secretary has contracted with to determine whether the provided services are covered by the Act and whether the amount charged for the services and care is fair and reasonable.

118 Cong.Rep. S1, 611 (daily ed. Sept. 27, 1972) (remarks of Senator Bennett) (emphasis added). Under the new system, Professional Standards Review Organizations ("PSROs") were given the responsibility of reviewing the necessity and quality of medical care provided to Medicaid beneficiaries. A PSRO is an organization representing substantial numbers of practicing physicians in local areas that assumes responsibility for the review of service (but not payments) provided through the Medicare and Medicaid programs. Senate Finance Comm.Rep. at 257.

"A PSRO would have the responsibility of determining—for purposes of eligibility for Medicare and Medicaid reimbursement—whether care and services provided were: first, medically necessary, and second, provided in accordance with professional standards. Additionally, the PSRO where medically appropriate, would encourage the attending physician to utilize less costly alternative sites and modes of treatment. The PSRO would not be involved with questions concerning the reasonableness of changes or costs or methods of payment nor would it be concerned with internal questions relating to matters of managerial efficiency in hospitals or nursing homes except to the extent that such questions substantially affect patterns of utilization. The PSRO's responsibilities are confined to evaluating the appropriateness of medical determinations so that medicare and medicaid payments will be made only for medically necessary services which are provided in accordance with professional standards of care.

The local PSRO would be primarily responsible for review of all medicare and medicaid services rendered or ordered by physicians in its area. *The purpose of the provision is to establish a unified review mechanism for all health care services under the aegis of the principal element of the health care equation, the physician.*

*Id.* at 261–62 (emphasis added).

Because PSROs were not in existence at the time of the adoption of the 1972 Amendments, Congress provided a transition system to allow inhouse utilization review until PSROs could be created. HEW PSRO Transmittal No. 22, June 20, 1975 *reprinted in* [] Medicare and Medicaid Guide (CCH) ¶ 27, 456. The utilization control imposed by Congress required: (1) physician certification and recertification of level of care needed; (2) plan of care; and, (3) medical review in SNFs, ICFs, and mental hospitals, and provided that the Utilization Review Committees within the institutions were to continue their activities pending assumption of review responsibilities by a Professional Standards Review Organization. (P.L. 92–603, §§ 207, 237, 239 and § 249F.) To enforce the statutory requirements of utilization review and PSROs, Congress imposed a penalty on those states that either failed to include utilization review procedures and/or PSROs in their state plan or failed to properly discharge their responsibility of assuring that proper utilization control procedures were in operation. 42 U.S.C. § 1396(b)(g) (1974).

To supplement the review of medical necessity and quality of care by Utilization Review Committees and PSROs, the Secretary monitored quality of care by imposing conditions of participation on medical institutions, including nursing homes. *See e.g.* 42 U.S.C. § 1396a(a)(28) (SNF standards); 42 C.F.R. 442 et seq.; *id.* at 405, Subpart K. Conditions of participation include, *inter alia*: (1) personnel requirements (licensing, areas of responsibility, and staffing levels); (2) service requirements (physician, nursing, dietetic, pharmaceutical, laboratory, radiologic, dental and social services); and (3) physical environment requirements (fire safety, emergency power, facilities for physically handicapped, patient rooms, facilities for special isolation care, dining and patient activity rooms, kitchen and dietetic service areas, and maintenance.) *See e.g.* 42 C.F.R. § 405, Subpart K (conditions for participation of nursing homes).

### B. The Issue Presented by the Wisconsin Variance System

As the majority correctly notes, states in order that they might participate in the

Medicaid program must adopt a plan of their own that conforms with the federal requirements embodied in the Medicaid Act and its implementing regulations. 42 U.S.C. § 1396a(b). The Wisconsin state plan provides for skilled nursing facilities, Wis.Admin.Code § HSS 132.13 (20), (21) (1982); and intermediate care facilities, *id.* at (8)(9) and incorporates the Secretary of Health and Human Services' conditions of participation. *Id.* at 105.106, 105.10, 105.-11. Both skilled nursing facilities and intermediate care facilities are required to perform utilization review. *Id.* at 105.-10(18)(SNF), 105.11(5)(ICFs). Utilization Review Committees are required to perform "continued stay" review. *Id.* at 105.-10(18)(h)–(n)(SNF), 105.11(5)(h-n)(ICF). Under the ICF and SNF "continued stay review" procedures, the Utilization Review Committees must develop "written criteria to assess the need for continued stay." *Id.* at 105.10(18)(h)(i)(SNF), 105.11(5)(i)(1)(ICF). When a patient is admitted to either an SNF or ICF nursing home, the Utilization Review Committee assigns a "specified date by which the need for his continued stay will be reviewed." ("Continued stay review date"). *Id.* at 105.10(18)(i)(1)(SNF), 105.11(5)(j)(1)(ICF). If the patient remains confined beyond the "continued stay review date," the Utilization Review Committee must determine whether the patient's continued hospitalization in the skilled nursing facility or the intermediate care facility is needed. *Id.* at 105.10(18)(K)(2)(1)(3)(SNF), 105.11(5)(m)(3)(ICF). If the Utilization Review Committee finds that the patient's continued hospitalization in the SNF or ICF is medically indicated, the committee sets a new continued stay review date. *Id.* at 105.10(1)(K)4(SNF), 105.11(5)(M)4(ICF). If the committee determines that continued confinement is not required, the patient and the attending physician are notified and the attending physician may present additional information or clarification of the need for continued institutionalization. *Id.* at 105.10(18)(K)5–8(M), (N)(SNF), 105.-11(5)(M)(5–8), (N)(O)(ICF). Thus, Wisconsin's state plan codifies as state law the conditions of participation imposed by the Federal Medicaid requirements. *See* 42 C.F.R. Part 456 Subpart E; *id.* at Subpart F.

The Wisconsin regulations further provide:

"(b) *Care Levels* 1. No person who requires care greater than that which the facility is licensed to provide shall be admitted to the facility.

2. No resident whose condition changes to require care greater than that which the facility is licensed to provide shall be retained."

Wis.Admin.Code § HSS 132.51(1)(b). Additionally, the Wisconsin regulations provide that a patient may be involuntarily removed from the facility, "[i]f the resident requires care other than that which the facility is licensed to provide." *Id.* at § HSS 132.53(2)(b)2. Finally, the Wisconsin Administrative Code includes a variance procedure, *i.e.*, a "grant[] of an alternative requirement in place of a requirement of this chapter." *Id.* at § HSS 132.21(1)(b).

(2) REQUIREMENTS FOR WAIVERS OR VARIANCES. A waiver or variance may be granted if the department finds that the waiver or variance will not adversely affect the health, safety, or welfare of any resident and that:

(a) strict enforcement of a requirement would result in unreasonable hardship on the facility or on a resident;

(b) An alternative to a rule, including new concepts, methods, procedures, techniques, equipment, personnel qualifications, or the conducting of pilot projects, is in the interest of better care or management.

*Id.* To obtain a variance from the requirement that facilities discharge patients requiring "care other than that which the facility is licensed to provide," the following information must be supplied to the Wisconsin Department of Health and Social Services:

"(1) Statement from the administrator indicating that he/she will assume responsibility for the resident, how care will be enhanced if variance is granted,

and how the care of other residents will not be diminished;

(2) Statement from the attending physician endorsing the resident in remaining at the facility without detriment to the individual resident's physical and mental health, and willingness of the physician to assume responsibility for the care of the resident; and

(3) Statement from the guardian or concerned relative (if any) requesting that the resident remain in the facility."

According to the briefs, Wisconsin implemented the variance procedure in response to physicians' concerns that an automatic transfer after the patient was recertified as needing a different level of care could be detrimental to their patients' health. One source of concern was the stress associated with relocation, i.e., "transfer trauma." The problem of mandatory and involuntary transfers is becoming more acute by the day: several studies dealing with the effect of relocating institutionalized elderly persons with substantial cognitive and/or physical impairments have revealed that the indiscriminate transfer of the patients involves a grave risk of a dramatic increase in more serious illness and even death.[4] Studies of transferred elderly nursing home residents have revealed increased mortality rates of as much as 500 percent to 900 percent. Killian, *Effect of Geriatric*

*Transfers on Mortality Rates*, 15 Social Work 19 (1970).

"Changes in the social environment may have deleterious consequences in terms of psychological well-being and health. Loss of loved ones and loss of familiar objects or surroundings, resulting in helplessness or despair, are related to medical-psychological disorders.... In general older persons seem to gain satisfaction and support from association with familiar objects and places and from association with persons living in the same environment...."

Thus, relocated nursing home patients frequently become depressed and disoriented, and reduce their levels of activity. Bourestom & Tars, *Alterations in Life Patterns Following Nursing Home Relocation*, 14 Gerontologist 506, 508 (1974). Psychological deterioration and serious physical illness may also result from the involuntary transfer. Miller & Lieberman, *The Relationship of Affected State and Adaptive Capacity to Reactions to Stress*, 20 J. Gerontology 492, 494 (1965). Indeed, the Secretary himself has recognized the pronounced and often irreversible dangers of transfer trauma:

"There is a genuine hazard in the relocation of infirm aging persons from one facility to another. Dramatic increases in mortality far in excess of what would

---

4. See generally, Borup, et al., *Relocation and Its Effect on Mortality*, 19 the Gerontologist, 135 (1979); Mercer & Kane, *Helplessness and Hopelessness among the Institutionalized Aged: an Experiment*, 4 Health and Social Work, 91 (1979); Zweig, and Csank, *Mortality Fluctuations Among Chronically Ill Medical Geriatric Patients as an Indicator of Stress Before and After Relocation*, 24 J. The Am. Geriatric Soc., 264 (1976); Gutman and Herbert, *Mortality Rates Among Relocated Extended-Care Patients*, 31 J. of Gerontology 352 (1976); Brand and Smith, *Life Adjustment and Relocation of the Elderly*, 29 J. of Gerontology 336 (1974); Brody et al., *Measuring the Impact of Change*, The Gerontologists, August, 1974 at 299; Lieberman, *Relocation Research and Social Policy*, The Gerontologist, December, 1974 at 494; Bourestom and Tars, *Alterations in Life Patterns Following Nursing Home Relocation*, The Gerontologist, December, 1974 at 506; Markus et al., *Some Factors and their Association with Post-Reloca-*

tion Mortality Among Institutionalized Aged Persons, 27 J. of Gerontology 376 (1972); Killian, *Effect of Geriatric Transfers on Mortality Rates*, Social Work, January, 1970 at 19; Kral, Grad, & Berenson, *Stress Reactions Resulting from the Relocation of an Aged Population*, 13 Canad.Psychiat.Ass.J. 201 (1968); Jasnau, *Individualized v. Mass Transfer of Nonpsychotic Geriatric Patients form Mental Hospitals to Nursing Homes, with Special Reference to the Death Rate*, 15 J. of the Am. Geriatric Soc. 280 (1967); Aldrich & Mendkoff, *Relocation of the Aged and Disabled: A Mortality Study*, 11 J. of the Am. Geriatric Soc. 185 (1963). Contrary to the Secretary's assertion at page 40 of his brief, it is entirely proper for courts to rely on medical literature concerning mortality risk. *See e.g. Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Brand & Smith, *Life Adjustment and Relocation of the Elderly*, 29 J. of Gerontology 336 (1974) (citations omitted).

normally be expected have been documented."

HEW, Advisory Memorandum AoA–TA–75–1, Feb. 19, 1975.

An examination of the record reveals that Wisconsin granted the variances because of the physicians' concerns about the effects of involuntary transfer on their patients. Many of the patients were confused at the time the physicians requested the variances. According to the medical records, these patients were suffering from organic brain syndrome, secondary to severe alcoholism; senile dementia; cerebral arteriosclerosis; and, in several cases, chronic brain syndrome. Thus, as my summary of the medical literature discussing transfer trauma sets forth or recounts, the patients' confused mental states rendered them less capable of coping with a change in nursing home surroundings and supports the conclusion that the physicians properly were concerned about the effects of an involuntary transfer on their patients' health. Moreover, the physicians gave specific reasons for finding that the breaking of bonds of trust and familiarity in removing a patient from a facility might very well be traumatic to the patient involved. These reasons included separation from a spouse, residence in the home for many years, a staff that could converse with an elderly resident who spoke only Italian, and a staff that could understand a resident with a severe speech impairment. Indeed, in one case, a variance was granted to allow a patient with a prognosis of three to six months to live to remain in an ICF so that he could spend his remaining time with his wife, who resided in the same nursing home. The fact that the physicians gave specific reasons for finding that removal from the facility would be especially traumatic for the patient involved obviously leads one to conclude that the physicians' variance applications were made in response to the individual needs of their patients, rather than routinely or automatically requested. Furthermore, a review of the granted variances also reveals that the State of Wisconsin has imposed special requirements on the facilities as a condition of granting the variances. These special requirements include forbidding the admission or retention of patients needing greater care than the facility is licensed to provide; provision for prompt discharge if the patient required acute care; retaining the patient's present doctor as the attending physician with more frequent visits from the physician; closer monitoring of the patient; and, increased documentation of the patient's status with frequent reports to the attending physician and the Wisconsin Department of Health. Thus, the State's imposition of additional requirements on both the attending physician and the institution is further support for the conclusion and contradicts the contention of the Secretary of Health and Human Services that the variances were not approved as a matter of routine. It is clear that the State granted the variances only in order that it might allow the physicians and the institutions to respond to the individual medical needs of their patients.

Having summarized the utilization review procedure mandated by the Medicaid Act and regulations and enacted by Wisconsin, and the variance system adopted by Wisconsin, I turn to the question of whether the Secretary's broad-brush statement of the issue in his appellate brief obscures the real issue in this case. According to the Secretary's appellate brief, the issue presented is: "Whether the Secretary's interpretive rule (requiring every Medicaid patient to be treated only in a facility certified to provide the level of care that the patient's physician has stated is needed) must be upheld as a reasonable interpretation of the medicaid act." This unfocused statement of the issue encompasses at least four potential issues: (1) the admission of a Medicaid patient to an inappropriate facility; (2) the failure of the attending physician to indicate whether, in the physician's medical judgment, a patient certified as in need of a level of care different from that provided by the facility in which he resides should be transferred and the failure of the facility to implement such transfer; (3) the facility's disregard of the need

to transfer the patient even though the attending physician recertifies the patient as needing a level of care greater or less than the facility is licensed to provide and indicates that in his medical judgment the patient should be transferred; (4) the refusal of the facility to transfer the patient when the attending physician certifies the patient as needing a level of care greater or less than the facility is licensed to provide but also indicates that in his medical judgment the patient should not be transferred. It is apparent to me that out of the myriad of problems that arise in the administration of the Medicaid system, this case presents one clear, specific issue: Whether Congress, in enacting the Medicaid Act, authorized the Secretary of Health and Human Services to require the automatic transfer of patients recertified as in need of a level of care different from that provided by the facility in which the patient resides without regard to whether, in the medical judgment of the attending physician, the patient should be discharged and without regard to the Utilization Review Committee's evaluation or the patient's continued need for institutionalization.

II. The Secretary of Health and Human Service's automatic transfer rule is not supported by the Medicaid Act, denies the physician's right to exercise his medical judgment, and undermines the very system of quality care assurance.

The Secretary of Health and Human Services bases his automatic transfer rule upon a broad, unsupported and expansive reading of the certification requirement of 42 U.S.C. § 1396b(g)(1)(A). This statute provides in relevant part:

"[T]he Federal medical assistance percentage ... shall be decreased by a per centum thereof ... unless the State agency responsible for the administration of the plan makes a showing satisfactory to the Secretary that ... there is in operation in the State an effective program of control over utilization of such services; such a showing must include evidence that—

(A) In each case for which payment is made under the State plan, a physician certifies at the time of admission, or, if later, the time the individual applies for medical assistance under the State plan (and the physician, or a physician assistant or nurse practitioner under the supervision of a physician, recertifies, where such services are furnished over a period of time, in such cases, at least every 60 days ... and accompanied by such supporting material, appropriate to the case involved, as may be provided in the regulations of the Secretary), that such services are or were required to be given on an inpatient basis because the individual needs or needed such services...."

The accompanying regulations specify that the recertification for each Medicaid beneficiary in a skilled nursing facility must state that "SNF services are needed" and for each beneficiary in an intermediate care facility that "ICF services are needed." 42 C.F.R. § 456.260; *id.* at § 456.360. The Secretary of Health and Human Service's reasoning is based on two premises. First, he argues that he has a duty to ensure that Medicaid beneficiaries receive the level of care to which they are entitled under the Medicaid Act. Secondly, he contends that requiring automatic transfer when the patient's physician (the Secretary fails to acknowledge that the recertification is performed by a layman or a physician on the Utilization Review Committee rather than the attending physician) certifies a Medicaid beneficiary as needing a level of care greater or less than the level of care provided by the facility ensures that patients will receive the care to which they are entitled and is in the patient's best interest.

As an initial matter the Secretary's ambiguous and misleading arguments about the meaning and purpose of the recertification requirement need clarification. Although the Secretary argues throughout his brief and reply brief that the recertification procedure assesses the level of care needed, portions of his reply brief and a

footnote in his main brief demonstrate that the Secretary confuses and misconstrues the assessment of the level of care needed with the assessment of whether the patient should be transferred. Specifically, the Secretary confuses recertification of level of care needed with the continued stay determination. The Secretary contends:

> "A requirement that a physician must attest to the patient's need for continued placement at a specific level of care, is [sic] recognizes that the physician's determination plays a key role.... [T]he Secretary has chosen to make that determination operative and binding. Reply Brief at 10.

\* \* \* \* \* \*

The Secretary has chosen, for sound and permissible reasons, to follow the level of care certified by the physician certification. The Secretary is not attempting to orchestrate delivery of medical services ... when he follows the physician's determination for sound, prophylactic reasons. Nor, it should be obvious, does the Secretary's decision to rely on the physician's certification mean that he has made labels attached to the facility the decisive factor or that he had made the physical facilities the end product ... by guiding himself by the physician's judgment. Reply Brief at 10.

\* \* \* \* \* \*

Had the physicians here truly been willing to shoulder responsibility for a decision not to transfer the patient to an SNF, they should have certified them as in need of the intermediate care services. HHS would accept this patient certification, although the facility would jeopardize its certification if it in fact failed to meet the patient's actual needs. But the physician instead certified the patients as in need of skilled services." Government's Main Brief at 39 n. 19.

This summary of the Secretary's argument reveals that the Secretary misunderstands (or purposefully misinterprets to achieve his desired result) the meaning and purpose of the certification requirement. First, according to the Secretary, a physi-

cian must certify that either skilled nursing facility or intermediate care facility services are needed and, if the facility is not licensed to provide the certified level of care indicated, the patient must be transferred. The Secretary's broad brush treatment of the decision whether to transfer a patient ignores the fact that the transfer decision involves three questions, rather than one: (1) Does this patient need a level of care greater or less than the level of care the facility is licensed to provide? (2) Is it in the best medical interest of this patient to transfer him to another facility? (3) Could the facility accommodate the needs of the patient should the attending physician and the Utilization Review Committee determine that the risk attendant to transfer outweighs the potential benefits to be obtained from the new facility? *Cf.,* Davidson, Utilization Control, *Medicaid Decisions: A Systematic Analysis of the Cost Problem,* 109 (1980) ("Misutilization falls into three categories: services that are medically unnecessary; services that are inappropriate—that is, although they are justifiable on clinical grounds, they are provided at a level more intense and therefore more expensive than necessary; and services that are considered socially unjustifiable because the cost of the service outweighs the benefit to be gained from it.") On the other hand, the Secretary discerns but one question—whether the patient needs a level of care greater or less than the level of care the facility is licensed to provide; according to the Secretary, transfer is automatic based upon a finding that the level of need does not match the level of medical services provided, regardless of the individual's needs. In other words, in the opinion of the Secretary, the decision to transfer is based on one single factor, level of care.

However, the Secretary contradicts his argument that the transfer decision must be based on the recertification of the level of care needed when he asserts that "[h]ad the physician here truly been willing to shoulder responsibility for a decision not to transfer the patient to an SNF, they should

have certified them as in need of intermediate care services. . . . But the physician instead certified the patients as in need of skilled services."[5] In advancing this contradictory argument, the Secretary casually suggests, without citation of authority, that the recertification decision may be broadened to include: (1) an assessment of the level of care needed, (2) whether the benefits obtained from transferring the patient to another facility outweigh the health risk associated with transfer and (3) whether the present facility can meet the patient's needs. Contrary to the Secretary's belief, the regulations and action transmittals *strictly* require the person performing the recertification to assess the patient's *"need of a particular level* (i.e. hospital, mental hospital, skilled nursing facility, and intermediate care facility) *of care."* DHHS, Health Care Financing Administration, Medicaid Action Transmittal 80–68; 42 C.F.R. § 456.260; *id.* at § 456.-360. A review of these regulations and action transmittal 80–68 fails to reveal *any* mention of assessing the risk of transfer or of the facility's ability to respond to the patient's increased need for care. Moreover, the Secretary assumes that the recertification assessment will be made by a physician. However, the regulations specifically provide that the recertification may be made by a "physician assistant or nurse practitioner . . . acting within the scope of practice as defined by state law and under the supervision of a physician." 42 C.F.R. § 456.260(b)(1); *id.* at 456.-360(b)(1). Thus, the person performing the

certification may not have sufficient medical training, and may not be qualified to assess the danger of transfer trauma much less the ability of the institution to accommodate the patient's needs. I am at a loss to understand how the majority comes to the conclusion that "the dissent mistakenly states that patients are moved between levels of care based on the decisions of physicians' assistants and nurse practitioners." The majority asserts that the patient's needs are adequately considered because "the transfer of a patient between levels of care is treated as a new admission and requires a physician's certification." The new admission does in fact require a physician's certification but only after the patient has been rejected and found unsuitable for the original facility based on the limited knowledge and experience of a physicians' assistant or nurse practitioner. Thus, a patient or a patient's family or guardian who rejects transfer to the new facility for whatever reason is deprived of the qualified medical judgment of a physician. Furthermore, the danger of transfer trauma would not be considered by the physician certifying the new admission for the certification procedure of itself concerns the question only of whether the patient requires the services provided by the new facility. Therefore, I am forced to disagree with the majority's assertion that the secretary's regulations create a "prophylactic interpretive rule which treats the physician's determination as the sole decisive factor." *See* State Medicaid Manual sec. 9220.[6]

---

**5.** An analogous pressure is placed on the physician by the Medicare Systems' adoption of the Prospective Payment System ("PPS"). Staff of Senate Special Committee on Aging, Impact of Medicare's Prospective Payment System on the Quality of Care Received by Medicare Beneficiaries, September 26, 1985 at 13. Under PPS, a patient is assigned to a Diagnostic Related Group ("DRG") upon admission to the hospital and the hospital receives a set fee depending upon the DRG assigned, no matter the actual costs. *Id.* at 10–11. The Staff of the Special Committee on Aging interviewed physicians as to the procedure they follow in deciding patient's real needs, and physicians "either 'fudge' the diagnosis (stretch the truth to provide enough hospital care to cover the admission) or

just decide to administer treatments that are not really indicated." *Id.* The physicians reported that they were pressured into "fudging" the diagnosis by potential criticism from the hospital's Utilization Review Committee for keeping patients too long. *Id.* "Thus the doctor is often placed in the position of cheating the system and caring for his patients or following the system and taking the consequences." *Id.*

**6.** State Medicaid Manual sec. 9220 provides that "(r)ecertification is the process by which a physician, *nurse practitioner or physician assistant* who has knowledge of the case attests to an individual's continued need for a specific type of level of care." (Emphasis added.) This regu-

A nursing practitioner or physician's assistant is not adequately trained to make the all-important decision dealing with levels of care. It is shocking in our day of advanced medical research, techniques and surgery, when organ transplants and space medicine research are routinely-accepted medical procedures, that we seem to be forgetting and casting aside the all-important human and personal element in medical care. It is equally shocking that we are in effect turning the medical transfer decisions over to the paper shuffling bureaucrat for a review of an inadequately trained medical support assistant. Nursing practitioners and physician's assistants are incapable of making this life-threatening judgment, because they lack both the personal contact with the patient and his family over a period of time, and most frequently lack the necessary expertise, training and experience in psychology, psychiatry and geriatrics required to properly interpret and knowledgeably assess the dangers of transfer trauma. Because the physician's assistant or nurse practitioner is not qualified to assess transfer trauma, the automatic transfer of a patient based solely on the recertification decision of a physician's assistant or nurse practitioners, in effect, amounts to a transfer based on a predetermined decision of the Secretary which does not consider the medical needs of the patient. Thus, the Secretary is interfering in the providing of medical services, contrary to the Congressional mandate not "to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided" is to be obeyed. The majority in fact *endorses* this dissent by admitting that the decision to transfer should be based on the *attending physician's* decision concerning the *appropriateness* of the transfer. But the majority erroneously—indeed, insensitively—confines the scope of the physician's judgment to exclude consideration of transfer trauma. The net result is that patients suffering from organic brain syndrome, senile dementia, Alzheimer's disease, cerebral arteriosclerosis and chronic brain syndrome may be transferred from one facility to another despite the educated, sincere, and considered medical judgment of their attending physicians against transfer.[7]

The secretary, of course, boldly asserts that he would accept a *recertification* of the patient as needing one kind of care when in fact another is necessary. The implication is that these important ele-

lation goes on to say that *"nurse practitioners and physician's assistants under the supervision of a physician may ...* recertify to the need for inpatient services ...." (Emphasis added.) It also lists as an acceptable form of recertification the "signed and dated statement by the physician, *nurse practitioner or physician assistant* who has knowledge of the case that continued care of a particular level or type is needed." (Emphasis added.) Thus, any one of the three in the medical support organization—the physician, the physicians' assistant or the nurse practitioner (only if "under the supervision of a physician")—may under the regulation recertify or refuse to recertify. *See also* 42 C.F.R. secs. 456.60, 456.160, 456.260, 456.360 (permitting this kind of recertification in hospitals, mental hospitals, SNFs and ICFs), implementing sec. 2183 of the Omnibus Budget Reconciliation Act of 1981, PL 97–35.

7. Furthermore, secs. 9220 and 9220.1 fail to define or delineate the duties and responsibilities of the "supervising" physician. Nor has diligent search revealed any other legal constraints requiring that the "supervising" physician be trained in psychology, psychiatry or geriatrics. Furthermore, "(w)hile the (supervising) physician may choose to provide direct, on-the-premises or over-the-shoulder supervision of the physician assistant or nurse practitioner who recertified the need for inpatient care, *general supervision will suffice for recertification purposes.*" Sec. 9220.1 (emphasis added). The regulations fail to define either "over-the-shoulder" or "general" supervision. This may very well be nothing more than having the supervising physician's secretary stamp his seal of approval on the form and his initialing the same thereafter without ever taking a detailed case history, much less even examining the patient in reaching and implementing this significant transfer decision.

Moreover, the regulations specifically exclude the attending physician from being a member of the Utilization Review Committee (secs. 456.135, 456.236, 456.336, and 456.436). *See also* CCH Medicare & Medicaid Guide, sec. 12.730. The regulation does not require that even one staff physician from the institution in which the patient resides be on the Utilization Review Committee. *Ibid.*

ments of the transfer decision might be brought "under cover" in the recertification decision. He fails to cite any authority whatever for this position, yet the majority unquestioningly accepts it as the truth. Indeed, the implication to be drawn from this rash recommendation ("Had the physician here truly been willing to shoulder responsibility for a decision not to transfer the patient to an SNF, they should have certified them as in need of intermediate care services.... But the physician instead certified the patients as in need of skilled services.") in effect suggests that the physician violate his Hippocratic oath, which requires in relevant part that a physician "prescribe regimen for the good of my patients according to my ability and my judgment and never do harm to anyone, ... nor give advice which may cause (the patient's) death," and that the physician "preserve the punity of my life and my art." It also demeans the integrity of the very practice of the profession—medicine. The Secretary's appellate counsel's proposal that the physician falsify the recertification of a patient needing skilled services through certifying the patient as needing an intermediate level of care is shocking and not worthy of an attorney following the precepts our code of professional responsibility. Further, the Secretary's suggestion ("[h]ad the physician here truly been willing to shoulder responsibility for a decision not to transfer the patient to an SNF, they should have certified them as in need of intermediate care services") not only distorts the meaning and purpose of the recertification requirement but also replicates the Wisconsin variance system without the safety features Wisconsin provides. The Secretary blandly asserts, "HHS would accept this certification [of a patient needing SNF care as an ICF patient], although the facility would jeopardize its certification if it in fact failed to meet the patient's actual needs," but explains neither how the falsely certified patient's care (*i.e.*, the patient needing skilled care who has untruthfully been certified as needing intermediate care) would be monitored nor how the institution would cope

with caring for a patient needing greater services if retaining the patient would affect the other patients' care. Wisconsin, on the other hand, requires a physician seeking permission to allow a patient needing increased services to remain in the present facility to inform the Wisconsin Department of Health and Social Services how the patient's care will be enhanced and how the other residents' care will not be diminished. Furthermore, the Wisconsin regulations require the attending physician to assume an increased type of responsibility for the care of the resident. Thus, in contrast to the Secretary's off-the-cuff assertion that physicians could avoid transfer trauma by falsifying the patient's certification (that is, by certifying a patient who, in fact needs skilled care, as needing intermediate care), Wisconsin places conditions and safeguards on a grant of a variance to ensure that the patient will receive adequate treatment and that allowing an SNF certified patient to remain in an intermediate care facility will not diminish the care of the other residents.

In sum, the Medicaid regulations and action transmittals restrict the person performing the recertification to an assessment of the level of care needed; from our research we have found no support in the Medicaid Act or regulations for the Secretary's belief that the person performing the recertification may consider whether the benefits obtained from transferring the patient to another facility outweigh the health risk associated with transfer or whether the present facility could accommodate the patient's needs if the risk associated with transfer outweigh the benefits obtainable in another facility. Since the Secretary's assertion that physicians could avoid transfer trauma by falsifying the recertification (by certifying a patient who, in fact needs skilled care, as needing intermediate care services) finds no support in the regulations or action transmittals and, in fact, replicates the Wisconsin system without incorporating its safeguards, the assertion rests on a foundation of quicksand; I reject the Secretary's appellate counsel's highly questionable contention as an ill-con-

ceived attempt to bolster a weak and speculative argument at best. Thus, the Secretary's briefs argue in effect that the decision whether to transfer the patient may be based on *only* one factor, the assessment of the level of care needed made by the person performing the recertification. With this clarification in mind, I turn to the Act, its regulations and its legislative history to determine whether Congress intended that Medicaid patients be automatically transferred, without regard to the medical judgment of the attending physician or the Utilization Review Committee solely because they are recertified as needing a level of care greater or less than the level of care the facility is licensed to provide.

The Secretary reasons that since the patient's level of need has changed, the patient's continued stay in the facility is no longer justified. However, the Secretary ignores and casts aside his own rules specifying that continued stay determinations are to be made by the attending physician and the physicians on the Utilization Review Committee. 42 C.F.R. 456.335 (continued stay in SNF); *id.* at 456.436 (continued stay in ICF). Moreover, the Secretary fails to acknowledge, as the Medicare and Medicaid statutes recognize, that the decision regarding the patient's transfer to another facility as a result of a change in the patient's health is a medical judgment that can, and must, only be made by licensed physicians, not by unqualified physician assistants or nurse practitioners. *See e.g.,* 42 U.S.C. § 1395x(1) (made applicable to Medicaid by 42 U.S.C. § 1396(a)(28)) ("transfer of patients will be effected between the hospital and the skilled nursing facility *whenever such transfer is medically appropriate as determined by the attending physician*). Indeed, the decisions whether to admit, discharge, or transfer a patient are traditionally and are properly only made by qualified medical professionals, licensed physicians and surgeons and regulated by state law. *See, e.g.,* Wis. Stat. § 448.01(9) ("Practice of medicine and surgery means: (a) to examine into the fact, condition, or cause of human health or disease, or to treat, operate, prescribe, or

advise for the same, by any means or instrumentality.") A physician, whether the attending physician or the physicians on the Utilization Review Committee conducting an extended stay review, must be allowed to consider all factors relating to the patient's health—physical, emotional, psychological, and familial—when exercising a proper medical judgment. *Doe v. Bolton,* 410 U.S. 179, 192, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973). "What is best for a [patient] is an individual medical decision that must be left to the judgment of physicians in each case. We ... emphasize that the decision should represent an independent judgment of what the [patient] requires and that all sources of information that are traditionally relied on by physicians ... should be consulted." *Parham v. J.R.,* 442 U.S. 584, 608, 99 S.Ct. 2493, 2507, 61 L.Ed.2d 101 (1979). Each and every medical problem requiring the exercise of medical judgment varies in complexity and severity, but what all cases have in common is an *"individual human being,"* a patient who has an illness or condition, whose treatment must be evaluated by one with the compassion, the authority and necessary medical training, and the intimate knowledge of the patient's problem and needs (including the patient's physical and psychological capacity to adjust to a change in nursing homes and the possible disruption of family ties), required to make the treatment decision: the physician. Nameless, faceless, lay government officials have neither the knowledge of the patient's needs, the medical training, nor the authority to make treatment decisions. As the Supreme Court determined in *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), governmental intrusion into the physician's medical judgment violates the constitutional rights of both physicians and patients.

"The right of privacy has no more conspicuous place than in the physician-patient relationship, unless it be in the priest-penitent relationship.

\* \* \* \* \* \*

The State licenses a physician. If he is derelict or faithless, the procedures available to punish him or to deprive him of his license are well known.... Crucial here, however, is state-imposed control over the medical decision.... The good-faith decision of the patient's chosen physician is overridden and the final decision passed on to others in whose selection the patient has no part. This is a total destruction of the right of privacy between physician and patient and the intimacy of relation which that entails.

The right to seek advice on one's health and the right to place reliance on the physician of one's choice are basic to Fourteenth Amendment values."

410 U.S. at 219, 93 S.Ct. at 761 (Douglas, J., concurring). *See also, Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Rosen v. Louisiana State Board of Medical Examiners*, 380 F.Supp. 875 (E.D.La.1974), *aff'd*, 419 U.S. 1098, 95 S.Ct. 767, 42 L.Ed.2d 795 (1975); *Nyberg v. City of Virginia*, 495 F.2d 1342 (8th Cir.), *cert. denied*, 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 316 (1974).

In the absence of a clear congressional mandate, courts must not assume that the federal government even intended to intrude into a field traditionally occupied by the States. *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). The legislative history of the Medicaid and Medicare Acts are devoid of any authority for the proposition that the Department of Health and Human Services may determine in individual cases the form of medical treatment to be provided. To the contrary, when Congress enacted the utilization review and PSRO provisions in 1972, it reiterated the position it had taken in the Medicare Act that, *"[n]othing in this subchapter shall be construed to authorize any Federal officer or employee*

*to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided."* 42 U.S.C. § 1395; *see* S.Rep. No. 1230, 92nd Cong., 2d Sess. 256–58 (1972); *United States v. University Hosp.*, 729 F.2d 144, 160 (2d Cir.1984).[8]

Furthermore, in the past, we have enjoined Medicare and Medicaid regulations that "have the effect of directly influencing a doctor's decision on what type of medical treatment will be provided, thus directly interfering with the practice of medicine." *Am. Med. Assoc. v. Weinberger*, 522 F.2d 921, 925 (7th Cir.1975). It is apparent to me that the Secretary's automatic transfer rule directly and unquestionably interferes with the practice of the profession of medicine. Because the Secretary mandates transfer upon the determination that the patient needs a level of care that the facility is not licensed to provide (in effect, mandating a determination that continued stay is no longer medically indicated based upon the recertification of the level of care needed), the Secretary's scheme permits the consideration of only one factor in deciding whether the patient should be transferred (*i.e.*, discharged from the nursing home)—the level of care needed. By restricting the physician's assessment to one factor (level of care needed), the Secretary prohibits the physician from weighing and balancing, based upon his medical knowledge and experience, the needs and requirements of the individual patient's medical and psychological problems, if any, to ascertain the risk associated with transfer, a determination that he is ethically required to make. Thus, the Secretary's rule restricting the physician's consideration to but one factor when deciding whether to transfer a patient clearly violates the rule that a physician and surgeon must be allowed to consider *all* factors relevant to

8. A similar prohibition of federal interference with hospital affairs was enacted in the Hill-Burton program.

"Except as otherwise specifically provided, nothing in this subchapter [42 U.S.C. sec. 291 *et seq.*] shall be construed as conferring on any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance or operation of any facility with respect to which any funds have been or may be expended under this subchapter."

42 U.S.C. § 291m.

the patient's health—physical, emotional, psychological and familial—when exercising his best medical judgment.

Indeed, restricting the physician's evaluation to one factor, "level of care needed," is an interference with and a travesty upon the practice of medicine and is particularly egregious in light of its impact on the area of geriatrics. Research has been conducted on the importance of thoroughly evaluating the medical and psychosocial needs of geriatric patients by a team of physicians, social workers, psychologists, geriatric dentists, occupational and physical therapists, and dietitians who developed a treatment and discharge plan tailored to each individual patient's needs. Champlin, DRGs: Putting the Squeeze on Your Older Patients? *Geriatrics*, July 1985 at 77. The study revealed that a thorough evaluation program " 'can have substantial, positive effects on a targeted subgroup of frail elderly in-patients beyond the benefits of the usual medical care.' The patients 'had a significantly longer survival and less use of acute-care and long-term institutional services after one year of follow-up.' " *Id.* at 78. Moreover, the substitution of the Secretary's rule for the physician's rational and reasoned judgment not only detrimentally interferes with the medical care elderly patients receive, but also intrudes in an area of the highest sensitivity—the transfer of the terminally ill patient. In the case of an involuntary transfer of a terminally ill patient, the transfer often removes him from the care of his regular physician, with whom he has developed a close and trusting relationship:

> "If he or she is alert, the loss of the physician may be particularly devastating. The physician may be thought to be abandoning the patient because of monetary concerns, despite all discussion to the contrary. It is not easy for the physician to forget the look on the face of the conscious dying patient being wheeled out of the hospital to spend his or her final hours with strangers."

Lind, Transferring the Terminally Ill, 311 *New England J. Med.*, 1181-2 (1984). As the facts of this case illustrate, the transfer ofttimes provides no benefit to anyone, much less the terminally ill patient. A patient with three to six months to live was ordered to be transferred from the nursing home where he resided with his wife. Since the patient was dying, the transfer could not save his life and could only rob him of a chance to spend his final days with his wife.

In brief, the Secretary's rule interferes with the practice of medicine by restricting the physician's assessment of whether the patient should be transferred to but one factor—the level of care needed. Because of the special needs of the elderly patient, including transfer trauma and the need for careful discharge planning based upon the thorough evaluation of the patient's medical and psychosocial needs, the Secretary's substitution of his judgment for that of the physician's intrudes into a decision of profound importance to the health of the geriatric patient. In short, the Secretary's transfer rule replaces the expertly trained physician's qualified and reasoned assessment of the patient's individual needs with an automatic transfer decision based on a determination, which in all probability is made by a non-professional, that one factor relevant to the patient's continued stay in the institution has changed—the level of care needed. In my opinion, the Secretary blatantly disregards Congress' specific admonition that he has *not* been authorized "to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395; S.Rep. No. 1230, 92nd Cong., 2d, Sess. 256–58 (1972). I am convinced from the language of the enabling legislation that Congress never intended to intrude into the doctor-patient relationship in this manner; nor can I believe that Congress enacted such a faceless and inhumane system as the Secretary of Health and Human Services seeks to implement. Congress has not abandoned its respect for the human dignity of our fellow man.

Moreover, the Secretary's automatic transfer rule not only interferes with the physician's exercise of his medical judg-

ment but also undermines the very statutory scheme of utilization review. The legislative history of the PSRO statute, enacted at the same time as the statute providing for utilization review and intended to replace in-house Utilization Review Committees, reveals that the certification requirement was intended to be a part of continued stay review:

"The PSRO ... would be responsible for reviewing attending physician's certifications of need for continued hospital care beyond professionally determined regional norms directly related to patients' age and diagnosis, using criteria such as the types of data developed by the Commission on Professional and Hospital Activities.... It is expected that such certification would generally be required not later than the point where 50 percent of patients with similar diagnosis and in the same age groups have usually been discharged.... *This professionally determined time of certification of need for continued care is a logical check point for the attending physician and is not to be construed as a barrier to further necessary hospital care.* Neither should the use of norms as check points, nor any other activity of the PSRO, be used to stifle innovative medical practice or procedures. The intent is not conformism in medical practice—the objective is reasonableness."

Senate Report at 263 (emphasis added). Indeed, the statutory scheme explicitly provides that the decision of whether to allow a patient to remain in a facility is to be made by those physicians and surgeons participating in the continued stay review process. 42 C.F.R. Part 456, Subparts E and F. The specialists, the physicians and surgeons performing the continued stay review, must review and consider the criteria developed to assess the need for continued stay. 42 C.F.R. §§ 456.332–336; 456.432–

436. By mandating transfer automatically upon recertification of a level of need the facility is not licensed to provide, the Secretary has bypassed the very utilization review system · he has developed and approved and required medical institutions to follow in that: (1) the physician assessing the question of whether the patient should remain in the facility is improperly required to limit the assessment to one factor, level of care needed, rather than all the factors relevant to the patient's health needs; (2) transfer is automatic and the patient and attending physician are deprived of their right to present additional information to the Utilization Review Committee, as guaranteed by 42 C.F.R. §§ 456.336; 456.337; 456.436; 456.437; (3) the Utilization Review Committee is prevented from performing its duty to assess the patient's reasons for staying against its criteria for assessing the need to stay; and (4) the criteria for evaluating the need for continued stay developed by the Utilization Review Committee have been cast aside and replaced by the Secretary's criterion—level of care needed.[9]

To summarize, the Secretary's automatic transfer rule (in effect, a determination that continued stay in the institution is not medically necessary based upon the recertification of level of care needed) destroys the very necessary and statutory division of authority between the Secretary and the medical profession. Indeed, the Secretary has lost sight of and completely disregarded the Congressional mandate that nothing in the Medicare or Medicaid Acts "shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395; S.Rep.No. 1230, 92nd Cong., 2d Sess. 256–58 (1972). Under the statutory scheme, the medical profes-

---

**9.** In footnote 8, the majority states that "we do not find utilization review relevant to the question before us...." However, as detailed in this dissent utilization review includes a review of the attending physician's recommendation regarding the transfer of the patient. Thus the Secretary's application of the automatic transfer

rule deprives the patient and physician of the opportunity to present additional information to the utilization review committee detailing the physician's concern that transfer of the patient to another facility should not be implemented at that particular time because of the attendant health risks.

sion, through Utilization Review Committees and PSROs, determines the medical necessity of care given to Medicaid beneficiaries. The Secretary assures quality of care by (1) ensuring that the Utilization Review Committees and PSROs, in fact, evaluate the medical necessity of the care given; and (2) imposing conditions of participation. Thus, under the statutory scheme enacted by Congress, physicians and surgeons determine whether it is medically necessary for a patient to remain in a facility. The Secretary assures quality of care by requiring review by Professional Standards Review Organizations and by imposing the conditions of participation (*i.e.*, the personnel, service and physical environment requirements). But, the statutory scheme does not permit the Secretary to overrule the physician's judgment of medical necessity or to deny the physician his right, and his responsibility, to make a medical judgment based upon all the factors relevant to the patient's health—physical, emotional, psychological, and familial. As noted above, the evaluation of the need to transfer a patient because continued placement in the institution is not medically indicated necessitates three determinations: (1) whether the patient requires a level of care greater or less than the level of care the facility is licensed to provide; (2) whether the benefits obtainable at a different facility outweigh the risk associated with transfer and (3) whether the facility could accommodate the patient's needs if the patient was not transferred. The first two questions (the assessment of level of need and the evaluation of risks and benefits) are medical judgments that may be made only and reviewed by medical professionals. The third question, whether the facility can accommodate the patient's needs, is analogous to the conditions of participation and is properly reviewed by the Secretary. The Secretary's interpretive ruling requiring transfer upon a recertification that the patient needs a level of care that the facility is not licensed to provide, prohibits the physician from evaluating the risk and benefits of transfer. Thus, the Secretary's interpre-

tive rule is invalid because it prohibits the physician from making a medical judgment to transfer the patient based upon all factors relevant to the patient's health, and prohibits the physicians and surgeons on the Utilization Review Committee from reviewing the decision to allow the patient to remain, and thus allows transfer without regard for the Utilization Review Committee's medical judgment of whether transfer would be detrimental to the patient's health. In my view, the Secretary's interpretive ruling must be struck down because it undermines the statutory scheme enacted by Congress by circumventing the continued stay review process mandated in the Medicaid regulations. *Commonwealth of Massachusetts v. Dept. of Health and Human Services*, 749 F.2d 89, 95–6 (1st Cir.1984). I would uphold the Wisconsin variance system because it allows the attending physician and Utilization Review Committee to evaluate the patient's need to remain in a particular facility after considering and weighing all the factors relevant to the patient's health needs—physical, emotional, psychological and familial. Wisconsin properly confines itself to the question it is authorized to review under the Medicaid quality of care assurance system—whether the institution can accommodate the patient's needs. The Wisconsin system, therefore, enacts the quality of care system contemplated by Congress: physicians and surgeons make an individualized assessment of the patient's medical needs and this assessment of the patient's medical needs is reviewed by other physicians and surgeons; the state evaluates whether the institution, in fact, may accommodate the patient's needs.

## III. DISPOSITION

The Secretary advances three arguments against remanding this case to the Departmental Grant Appeals Board ("Appeals Board"): (1) the state failed to present evidence establishing the existence of transfer trauma; (2) the Wisconsin variance procedure does not conform to the plan submitted to the Secretary; and (3)

Wisconsin failed to follow its variance procedure in granting variances. Wisconsin was not required to present evidence establishing the existence of transfer trauma to the Appeals Board, the district court or this court. The decision of whether transfer trauma is a sufficient risk outweighing the benefits obtainable from the transfer is a medical judgment that may only properly be made and reviewed only by physicians and surgeons, not by the courts. "The mode and procedure of medical diagnostic procedures is not the business of judges. What is best for a [patient] is an individual medical decision that must be left to the judgment of physicians in each case. We … emphasize that the decision should represent an independent judgment of what the [patient] requires and that all sources of information that are traditionally relied on by physicians and behavioral specialists should be consulted." *Parham v. J.R.*, 442 U.S. 584, 607–08, 99 S.Ct. 2493, 2507, 61 L.Ed.2d 101 (1979). No judge on this court, nor on any other court that I know of, has the necessary medical training to evaluate the medical and psychosocial needs of geriatric patients; we are neither physicians, medical social workers, or psychologists but are only judges of the law. Furthermore, as my discussion of the utilization review system demonstrated, Wisconsin followed the quality of care system more closely, and in better faith, than the Secretary; the state required recertification of the patient's need for care and properly allowed the Utilization Review Committees to determine the question of whether the patient should remain in the facility. Wisconsin confined itself to the only question within its statutory authority—whether the facilities could accommodate the patient's needs. Finally, as to the question of whether Wisconsin adhered to its variance procedure when granting variances, the Appeals Board refused to reach this question. I would remand this case to the Appeals Board to determine whether Wisconsin followed its variance procedure.

The Secretary has misinterpreted the statute requiring the states to conduct concurrent utilization review as mandating transfer if the patient is recertified as needing a level of care that the facility is not licensed to provide. By requiring transfer based upon an assessment of level of care needed, the Secretary unduly restricts the physician's assessment of the patient's needs to one factor (level of care needed) and bypasses the statute's utilization review system for conducting extended care review and thereby undermines the statutory scheme by circumventing the continued stay review process mandated in the Medicaid regulations. The result of the Secretary's distortion of the utilization review system is the forced transfer of nursing home patients in the face of their physicians' or a Utilization Review Committee's medical judgments that the transfer would be detrimental to their health and may cause the death of the patient. I dissent.